917 F.2d 1347
 63 Ed. Law Rep. 777
 Amer AL-ZUBAIDI, Plaintiff-Appellant,
v.
M.A. IJAZ, Defendant-Appellee,
and
Virginia Polytechnic Institute and State University; Kazuo
Gotow; Richard A. Arndt; S.P. Almeida; John R. Ficenec;
C.D. Williams; L. David Roper; T.K. Lee; William Lavery;
Thomas E. Gilmer, Jr., Defendants.
 No. 89-1476.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1990.
Decided Nov. 6, 1990.
 
 Gerald Thomas Zerkin (Karen Ely-Pierce, Gerald T. Zerkin & Associates, Richmond, Va., on brief), for plaintiff-appellant.
 Jerry Dean Cain, III, General Counsel and Sp. Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., Richmond, Va.; Kay Heidbreder, Associate General Counsel and Sp. Asst. Atty. Gen. Virginia Polytechnic Institute and State University, on brief) Blacksburg, Va., for defendant-appellee.
 Before RUSSELL and MURNAGHAN, Circuit Judges, and GARBIS, United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Amer Al-Zubaidi is a former physics student who was pursuing his doctorate at Virginia Tech until his studies were terminated by a committee of the physics department. In this suit, he claimed that he was terminated because of discrimination against him based upon his religion. Below, the jury found for Al-Zubaidi and awarded him $450,000 in damages. The district judge reversed this verdict and granted JNOV for the defendant. Al-Zubaidi appealed this ruling, and argues that JNOV was not proper. We find that the district judge correctly granted JNOV, and affirm.
 
 
 2
 During the latter years of his graduate studies, Al-Zubaidi was supervised by Professor M.A. Ijaz. Al-Zubaidi and Ijaz are both Muslim; however, Al-Zubaidi is a Shi'ite Muslim, whereas Ijaz is a Sunni Muslim. In this suit, Al-Zubaidi claimed that Ijaz discriminated against him because the two are of different Muslim sects, and that this discrimination caused Al-Zubaidi's dismissal from Virginia Tech. At trial, it was established that Ijaz attempted to get Al-Zubaidi to sign a petition asserting the correctness of the Sunni beliefs, and that Ijaz further requested that Al-Zubaidi gather the signatures of other Muslims. Al-Zubaidi refused, and in this suit he claimed that Ijaz sabotaged his graduate studies because of that refusal.
 
 
 3
 The issue at trial, during the post-trial motions, and now on appeal, is whether discrimination by Ijaz caused Al-Zubaidi's termination. In granting the defendant's motion for JNOV, the district judge found that the evidence overwhelmingly proved that Al-Zubaidi would have been terminated regardless of how Ijaz acted toward Al-Zubaidi. The judge noted that the plaintiff's doctoral committee was composed of four persons including Ijaz, and found that Ijaz's lone vote would have been insufficient to terminate Al-Zubaidi from the physics program. In this appeal, Al-Zubaidi argues that Ijaz deliberately poisoned the entire doctoral committee against him, so that all of the votes were the product of discrimination. Ijaz counters that it was well known in the physics department that Al-Zubaidi was a poor graduate student, that the committee primarily terminated Al-Zubaidi for that reason, and that any prejudicial actions taken by him had little effect. We agree that the record establishes that Al-Zubaidi's termination was not caused by discriminatory action by Ijaz, and affirm the granting of JNOV by the district judge.
 
 
 4
 Before we discuss our decision, one procedural note is in order. Al-Zubaidi originally filed his suit against Ijaz, the members of the doctoral committee, and Virginia Tech. On defendants' motion for summary judgment, the district judge dismissed all of the defendants except Ijaz. The court ruled that there is no vicarious liability in a Section 1983 action, and thus the other defendants could not be liable since there was no evidence of discrimination on their part. On appeal, Al-Zubaidi does not dispute that legal premise. However, he asserts that these are necessary parties for the fashioning of an equitable remedy of reinstatement as a student. The appellee responds that an order of reinstatement would not be appropriate, because it would effectively order Virginia Tech to process and graduate Al-Zubaidi regardless of his ability. Because we are upholding the decision that Al-Zubaidi's termination was not caused by discrimination, we do not reach that issue.
 
 I.
 
 5
 In considering a JNOV motion, the trial judge may not weigh the credibility of witnesses or weigh evidence. Whalen v. Roanoke County Bd. of Supervisors, 769 F.2d 221, 226 (4th Cir.1985), rev'd on other grounds, 797 F.2d 170 (4th Cir.1986) (en banc). Also, the district judge may not base a grant of JNOV on materially contradicted evidence. Lust v. Clark Equipment Co., 792 F.2d 436, 440 (4th Cir.1986). Finally, the court may not substitute its judgment for the jury's. However, the jury may only draw inferences from the evidence that are "reasonably probable," and "mere speculation is insufficient" to support a verdict. Austin v. Torrington Co., 810 F.2d 416, 420 (4th Cir.1987).
 
 
 6
 In this case, the district judge found that the jury's verdict was contrary to the evidence. The district judge granted JNOV because the evidence clearly did not satisfy the "but for" test set forth in Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).
 
 
 7
 Although the district judge did not recount the evidence of Al-Zubaidi's shaky academic record in his memorandum opinion granting JNOV, the evidence in the record supporting that position is strong. Al-Zubaidi had begun his Ph.D. program at Virginia Tech in December 1976. By September of 1981, Al-Zubaidi had performed well in the classroom but had performed poorly in academic research, which was an indispensable part of his studies. Al-Zubaidi's grades were good; he had earned a 3.51 grade point average at Penn State while obtaining his master's degree in physics, and he earned a 3.6 at Tech in his classroom studies. Al-Zubaidi's downfall came in the laboratory, however--not the classroom. For the first three years of his studies, he put in far less time in the lab than is expected of a satisfactory graduate student. He later picked up the pace, but proved to be weak outside the classroom and, also, dangerous. Because of his poor skills in using Tech's nuclear reactor, in September of 1981 the University Reactor Safety Committee forced Al-Zubaidi to complete successfully a reactor safety program before he could again handle radioactive material or alter or move shielding without approval.
 
 
 8
 After Al-Zubaidi had been at Tech for two years, Physics Professor W. Peter Trower requested that the graduate committee terminate his studies. Al-Zubaidi had been assigned to aid Trower in grading tests in his "Physics As A Liberal Arts" class, a low level course. Trower wrote the committee to state that Al-Zubaidi was incapable of performing the task. He stated that Al-Zubaidi "had neither the talent nor the temperament to benefit either me or the student in this course." He added that Al-Zubaidi "showed precious little understanding of the most basic physics ideas nor was he able to demonstrate any ability to learn even when encouraged to do so." He also commented that "[e]ven making generous allowances for the cultural differences, I predict that Al-Zubaidi will never be able to perform, even marginally, as a practicing physicist." Despite this recommendation, Al-Zubaidi remained as a student. Yet, after being at Tech for five years, it appears that his skills had not improved. In a letter to an associate dean of the graduate school dated September 21, 1981, Associate Physics Professor Samuel P. Bowen assessed Al-Zubaidi's progress in his lab work in his research. The report was critical of Al-Zubaidi's progress and summed up its assessment by stating that "many of my colleagues and I do not judge that Mr. Al-Zubaidi's talents are well adapted to physics research."
 
 
 9
 Bowen wrote this letter as part of an evaluation of whether Al-Zubaidi should continue on his current research project or start a new project. Al-Zubaidi elected to select a new topic and committee. Approximately one month later, on October 15, 1981, the chairman of Al-Zubaidi's Ph.D. Advisory Committee, Professor Parkinson, resigned. Parkinson had departed Tech to work on his own physics research in Argentina. In Parkinson's letter to Al-Zubaidi discussing the future of Al-Zubaidi's studies, Parkinson complained that Al-Zubaidi had taken so much of his time that he had not been able to attend to his other responsibilities adequately. We do not know how much of an influence Al-Zubaidi's time-consuming presence was on Parkinson's decision to resign and leave for Argentina; however, it clearly had an impact. In December of 1982, Parkinson provided a short evaluation of Al-Zubaidi's abilities based upon the almost four years that Parkinson served as chairman of Al-Zubaidi's Ph.D. committee. Parkinson stated that Al-Zubaidi's progress had been slow, that Al-Zubaidi required a great deal of assistance with the reactor, that Al-Zubaidi occupied more of Parkinson's time than any other doctoral student that Parkinson had ever counseled, and that Al-Zubaidi had good theoretical skills but was "poorly qualified for experimental research."
 
 
 10
 After Parkinson's resignation, Al-Zubaidi was in need of a new Ph.D. committee chairman and a new committee. He approached Professor Ijaz, who agreed to form a committee and to chair it. In addition to working with Al-Zubaidi, Ijaz attempted to persuade Al-Zubaidi to sign a declaration that would indicate that Al-Zubaidi was a firm Sunni Muslim. Ijaz was attempting to gather signatures demonstrating a strong Sunni Muslim presence at Tech so that the government of Saudi Arabia might provide financial support for the building of a mosque and school for Muslim students in the surrounding area. Al-Zubaidi refused to sign, because that declaration conflicted with his Shi'ite beliefs, and he also refused to try to obtain signatures from his wife, other students and faculty members. After Al-Zubaidi gave Ijaz his final decision that he would not sign the petition, Al-Zubaidi claims that Ijaz responded by saying "I don't know you." Al-Zubaidi says this meant that Al-Zubaidi was now a non-person so far as Ijaz was concerned.
 
 
 11
 Circumstantial evidence presented at trial inferred that Ijaz attempted to undercut Al-Zubaidi's standing in the physics department because of Al-Zubaidi's refusal to cooperate in the petition drive. Al-Zubaidi was to conduct his research under Ijaz at the Oak Ridge National Laboratory, yet it appears that Ijaz stonewalled Al-Zubaidi's efforts to conduct that research. Ijaz attempted to block Al-Zubaidi's access to Oak Ridge, sometimes saying that he would take Al-Zubaidi back to that facility, and sometimes saying that he would obtain the research data from Oak Ridge himself. However, Ijaz never provided this assistance. Even when Al-Zubaidi requested that Ijaz retrieve the computer data tape and computer program that Al-Zubaidi was using at Oak Ridge, Ijaz failed to produce. Ultimately, Ijaz produced several useless tapes, which, according to Al-Zubaidi, had no data on them.
 
 
 12
 Despite this lack of data, Al-Zubaidi began writing his dissertation pursuant to Ijaz's direction. Apparently, Al-Zubaidi was able to write the first two chapters without difficulty. The third chapter was supposed to contain the data that he did not have, and chapter four was supposed to explain the data from chapter three. Despite this lack of data, Al-Zubaidi attempted to draft a chapter four based upon his predictions, although he was unable to draft a chapter three. Upon reviewing Al-Zubaidi's writing, Ijaz found that chapter four was unsatisfactory and indicated that he wanted to see Al-Zubaidi again on the following Monday, which was three days away. Al-Zubaidi was not told of the purpose of the Monday meeting; however, when he came in on that day, Ijaz informed him that he would be giving a presentation about his dissertation to his Ph.D. committee in two days, on a Wednesday. Al-Zubaidi was upset over this planned meeting, since he had not received any data or finished his dissertation. Yet, Al-Zubaidi did give a presentation and answered questions that Wednesday. The record does not reflect whether these questions were answered correctly. Eventually, Ijaz ended the presentation, and Al-Zubaidi was excused. Although Al-Zubaidi was not privy to the committee's discussions, he did learn that Ijaz did not give the committee copies of his draft of the first two chapters of his dissertation. Following the Al-Zubaidi presentation, the Ph.D. committee met and decided to resign. The four members of the committee then issued a short statement to the Chairman of the Graduate Committee indicating their reasons for resigning. They indicated that Al-Zubaidi did "not have the basic understanding and skill to pursue a Ph.D. in nuclear physics," "that he ha[d] not shown much progress independently," and that he had failed to exhibit "creative scholarship." After receiving this recommendation, the head of the physics department, Dr. Gilmer (who was not on Al-Zubaidi's committee), wrote to Al-Zubaidi informing him of the resignation of his Ph.D. committee, and asking Al-Zubaidi to resign. In his letter, Gilmer indicated that he was not asking Al-Zubaidi to leave because of the resignation of his Ph.D. committee. Instead, Gilmer indicated that all of the faculty members that were closely connected with Al-Zubaidi's research at Tech had no confidence in him. Importantly, the graduate committee had indicated to Gilmer that there was little prospect of Al-Zubaidi meeting expected research standards. Al-Zubaidi refused to resign and was terminated.
 
 
 13
 As an aside, as Al-Zubaidi's termination was nearing, Oak Ridge indicated that Al-Zubaidi should not return until his skills had improved substantially. In response to an inquiry by Ijaz, an Oak Ridge official indicated that Al-Zubaidi had no competency in computer programs, that he could not understand various physics concepts, that he made little progress learning things taught him at Oak Ridge, and that he had become a nuisance to the Oak Ridge computer staff.
 
 
 14
 Based upon this factual pattern, we find that the district judge was correct in granting JNOV. Admittedly, the evidence indicates that Ijaz was not helpful to Al-Zubaidi once Al-Zubaidi refused to sign Ijaz's petition. The denying of data results and the withholding of two chapters of Al-Zubaidi's draft dissertation from the Ph.D. committee could possibly be construed as an act of sabotage against Al-Zubaidi's standing. Al-Zubaidi argues that these acts prevented the committee from getting a true picture of Al-Zubaidi's abilities and research abilities.
 
 
 15
 We reject that argument. The record indicates clearly that Al-Zubaidi was always a poor researcher, which is an indispensable skill in working on a Ph.D. in physics. Dr. Trower had recommended Al-Zubaidi's termination as early as 1978 because of a perceived lack of ability. Dr. Parkinson came to this same conclusion after four years of chairing Al-Zubaidi's Ph.D. committee. Officials at the Tech reactor and at Oak Ridge had no confidence in Al-Zubaidi's abilities. These poor reviews were not the result of any antagonism by Ijaz. We agree that if Ijaz sought to sink Al-Zubaidi, then Ijaz was attempting to sink a ship that already was sinking. Indeed, the record indicates that the graduate committee's decision to recommend the termination of Al-Zubaidi was based on Al-Zubaidi's entire file, not just on the presentation made to the Ph.D. committee. It also indicates that Dr. Gilmer attempted to gather a sample of opinion on Al-Zubaidi outside of his final Ph.D. committee before proceeding with the termination. Thus, the decision to terminate Al-Zubaidi was not based only on the Ph.D. committee presentation. Despite his success in the classroom, Al-Zubaidi had simply failed as a researcher.
 
 
 16
 Accordingly, we affirm the dismissal of this case. The record regrettably indicates that Al-Zubaidi's downfall was attributable to his lack of research ability.
 
 AFFIRMED
 GARBIS, District Judge, dissenting:
 
 17
 I respectfully dissent.
 
 
 18
 As the court's opinion indicates, Amer Al-Zubaidi was terminated from the graduate program in physics at Virginia Tech in January 1983. Al-Zubaidi, a Shi'ite Muslim, alleged that his termination was caused by religious discrimination against him by his advisor, M.A. Ijaz, a Sunni Muslim.[1] The jury's verdict in favor of Al-Zubaidi was based on a special verdict form, in which the jury answered the following questions:
 
 
 19
 Do you find from a preponderance of the evidence that the defendant took action to prevent the plaintiff from obtaining his Ph.D. at Virginia Tech because plaintiff refused to sign the religious statement in evidence and/or because the plaintiff and the defendant belong to different religious sects?
 
 
 20
 2. Do you find from a preponderance of the evidence that the defendant's discriminatory action proximately caused the plaintiff's termination from the Ph.D. program at Virginia Tech?
 
 
 21
 3. Do you find from a preponderance of the evidence that the plaintiff was capable of successfully completing the Ph.D. program at Virginia Tech but for the defendant's discriminatory action?
 
 
 22
 J.A. at 453-54. The jury answered "yes" to all of these questions and awarded Al-Zubaidi $450,000 in damages.[2] After the jury verdict, the district judge granted JNOV in favor of the defendant. The plaintiff appeals.
 
 
 23
 The proper standard for evaluating Al-Zubaidi's claim is drawn from Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See Appellee's Br. at 8-9; Appellant's Reply Br. at 11. The Supreme Court stated that:
 
 
 24
 [T]he burden was properly placed upon the respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'--or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment in the absence of the protected conduct.
 
 
 25
 429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted).
 
 
 26
 In ruling on the appellee's motion for JNOV, the district court wrote:
 
 
 27
 [T]here was no evidence that the other members of the plaintiff's doctoral committee were influenced by any religious discrimination on the part of Dr. Ijaz. The decision to terminate plaintiff from the Ph.D. program was a committee decision requiring more than one vote in favor of termination. Therefore, the defendant's lone vote, even if the product of religious discrimination, would have been insufficient to cause the plaintiff to be terminated from the program.
 
 
 28
 J.A. at 460. Additionally, the instructions to the jury indicated that the "proximate cause" test for answering question No. 2 was met when an "act or omission played a substantial part in actually bringing about or causing the injury or damage." J.A. at 370 (emphasis added).[3]
 
 
 29
 The district court thus based its opinion granting JNOV on the notion that even though Ijaz was motivated by religious discrimination in his actions towards Al-Zubaidi, he cast only one "lone vote" on the thesis committee. Therefore, according to this theory, his vote alone would not have been sufficient to terminate Al-Zubaidi, since three others voted in favor of termination. Moreover, subsequent action taken by the Graduate Committee and Dr. Gilmer leading to Al-Zubaidi's termination was taken without Ijaz's involvement.[4]
 
 
 30
 The majority adopts the principle that the final decision to terminate Al-Zubaidi was insulated from the effects of Ijaz's discriminatory conduct:
 
 
 31
 [T]he graduate committee's decision to recommend the termination of Al-Zubaidi was based on Al-Zubaidi's entire file, not just on the presentation made to the Ph.D. committee. It also indicates that Dr. Gilmer attempted to gather a sample of opinion on Al-Zubaidi outside of his final Ph.D. committee before proceeding with the termination. Thus, the decision to terminate Al-Zubaidi was based not only on the Ph.D. committee presentation.
 
 
 32
 Major. op. at 1351. Thus, because Dr. Gilmer relied on other sources in addition to Ijaz and the thesis committee in deciding to terminate Al-Zubaidi, the majority upholds that decision.
 
 
 33
 I dissent because this court affirms the district court's decision on this point without mentioning a crucial consideration for evaluating an academic committee's review of a student's work. The majority discounts the enormous effect the evaluation made by the student's own advisor can have on other faculty members' opinions of the student's work.
 
 
 34
 In fact, in declining to address this issue, the majority chooses not to discuss a case cited to the court by the appellant that directly supports the appellant. In Haimowitz v. University of Nevada, 579 F.2d 526 (9th Cir.1978), the plaintiff alleged he was terminated in retaliation for having lodged allegations of grade improprieties against his department chairman, and for having counseled a student to report to the dean another department member's alleged sexual advances towards her. Id. at 530. The Ninth Circuit rejected the appellees' claim that if discriminatory conduct occurred only at the advisory level, the ultimate decision is insulated from attack. The court wrote:
 
 
 35
 The district court, and now the appellees, ... argu[e] that any retaliation was only at the advisory level. It is thought by the appellees that the improper bias is too far removed from the final decisionmaking to be of constitutional moment. Appellees have not cited any legal authority for their position. Rather, it appears that in cases where recommendations form the basis for the nonretention decision, this input is critical. For example, in Bertot v. School District No. 1, Albany County, Wyoming, 522 F.2d 1171, 1181 (10th Cir.1975), the court said:
 
 
 36
 The recommendation to the Personnel Committee, its recommendations to the Board, and the Board's reasons for non-renewal of the contract are of critical importance in deciding whether the action adverse to her was for the exercise of her constitutional rights.
 
 
 37
 See also Smith v. Losee, 485 F.2d 334, 336-40 (10th Cir.1973), cert. denied, 417 U.S. 908 [94 S.Ct. 2604, 41 L.Ed.2d 212] ... (1974).
 
 
 38
 The view expressed in these two cases is clearly more in tune with the practical realities of the decisionmaking process. The recommendation of the fellow members of a department will surely be a major, if not determinative, factor in the final employment or tenure decision.
 
 
 39
 Id. at 530. The court reversed the grant of summary judgment and returned the matter for factfinding on the merits.
 
 
 40
 Similarly, in upholding the district court's grant of JNOV, the majority ignores the substantial effect Ijaz's actions and opinions must have had on the thesis committee members evaluating Al-Zubaidi's performance. The poor quality of Al-Zubaidi's laboratory work was the primary reason cited for his discharge. In judging that work, the committee must have relied on Ijaz's input, since, as Al-Zubaidi's thesis advisor, he would have been in the best position to evaluate Al-Zubaidi's research abilities.[5]
 
 
 41
 The record demonstrates the ways in which Ijaz's actions and recommendations regarding Al-Zubaidi affected the judgment of the other faculty members. The thesis committee's evaluation of Al-Zubaidi's work would have been based primarily on Ijaz's insights into his capabilities. None of the thesis committee members had any personal familiarity with Al-Zubaidi's work. Ijaz did not provide them with copies of the written work Al-Zubaidi had completed. Their only direct familiarity with Al-Zubaidi's work was the brief oral presentation Ijaz had hastily arranged. Given that Ijaz was the conduit to the committee for information about Al-Zubaidi's work, the jury was free to conclude that the other faculty members sitting on these committees did not exercise their own independent judgment in evaluating Al-Zubaidi, but simply rubber-stamped Ijaz's discriminatorily inspired abandonment.
 
 
 42
 Given that Mt. Healthy places the burden on the defendant to prove the discriminatory conduct had nothing to do with Al-Zubaidi's termination, the district judge effectively granted a directed verdict in favor of defendant on a claim defendant was required to prove. However, as in Haimowitz, neither the majority, the district court, nor the appellee has cited any authority at all for the proposition that Ijaz's influence stops as a matter of law with his own "lone vote." I would reverse and remand to require the district court to consider, under the proper standard, how far that influence was felt.
 
 
 43
 In addition, I dissent because I believe the record provides substantial evidence to support the jury's verdict under the Mt. Healthy standard. Ijaz clearly sabotaged Al-Zubaidi's experimental research work, and it would have been reasonable for the jury to conclude that any faculty decisions based on the progress of his research to that point must have been tainted by the roadblocks Ijaz threw up to get back at Al-Zubaidi. After Al-Zubaidi first declined to sign Ijaz's petition rejecting Shi'ite beliefs in December 1981, Ijaz required Al-Zubaidi to change topics, from the decay of mercury to alpha decay. Ijaz provided tapes without any data on them for Al-Zubaidi to use in preparing his analysis, which meant Al-Zubaidi had no raw material to work with. In fact, without Al-Zubaidi's knowledge, Ijaz signed Al-Zubaidi's name to an agreement with Oak Ridge National Laboratories terminating Al-Zubaidi's privileges with the lab. This effectively prevented Al-Zubaidi from gathering any more data on his own, without relying on Ijaz himself.
 
 
 44
 In arranging the meeting with the thesis committee to review Al-Zubaidi's progress, Ijaz created an atmosphere that was least likely to lead to a positive evaluation of Al-Zubaidi's work. After Al-Zubaidi provided the first two chapters of the dissertation, Ijaz initiated the thesis committee meeting. However, because Ijaz had obstructed his attempts to obtain data from Oak Ridge, Al-Zubaidi could not complete the next two chapters, in which he which would have analyzed that data. Ijaz gave Al-Zubaidi only two days to prepare, and he remained unavailable to assist Al-Zubaidi during that time. And although Al-Zubaidi had completed those first two chapters, Ijaz failed to provide drafts of them to the committee. The opinions of the thesis committee were thus formed by a presentation Ijaz himself had initiated, but simultaneously hindered. Therefore, the committee members' opinions of Al-Zubaidi's work, even aside from Ijaz's personal opinion, were unavoidably colored by Ijaz's conduct.
 
 
 45
 Ijaz's negative evaluation of Al-Zubaidi's research skills and his efforts to stymie Al-Zubaidi's research progress must be presumed to have been motivated by religious discrimination.[6] Therefore, any subsequent reviewer's evaluation which placed any weight on Ijaz's recommendation or on the recommendation of the thesis committee as a whole would be tainted by that improper motivation and could not be considered in evaluating the merits of the termination. The only way to avoid the widespread taint of Ijaz's religious animus would be to determine that the Graduate Committee and Department Chairman Gilmer would have acted as they did without relying at all on Al-Zubaidi's lack of data, on the thesis draft that was incomplete because of the lack of data, or on the thesis committee's decision to resign. Under the standard set forth in Mt. Healthy, appellee had the burden to prove that the ultimate decision to terminate Al-Zubaidi would have been made anyway, without any reliance on Ijaz's discriminatory conduct and all its subsequent results.[7]
 
 
 46
 I submit that the matter should be remanded for the district court to decide the motion for JNOV under the proper Mt. Healthy standard while giving due consideration to the influence Ijaz's discriminatorily inspired actions may have had on the ultimate termination decision. Given the enormous influence a faculty advisor's opinions can have, as noted in Haimowitz, I believe it is simply incorrect to say as a matter of law that Ijaz counted as only one vote when the thesis committee he chaired evaluated a student he advised, or that Ijaz's influence ended with the single vote he cast. Under the proper Mt. Healthy standard, the defendant was required to show that the University would not have terminated Al-Zubaidi in the absence of Ijaz's discrimination and all the effects which flowed from it. I believe that enough evidence exists in the record to support the jury's verdict for Al-Zubaidi and their finding of causation.
 
 
 47
 For the foregoing reasons, I respectfully dissent from the majority's decision.
 
 
 
 [1]
 There is a deep religious schism between Shi'ite and Sunni Muslims. The activities of Ijaz proven in this case demonstrate the enmity between these two groups. The statement that Ijaz asked Al-Zubaidi to sign not only indicated that Shi'ites like Al-Zubaidi are "completely misled," but went on to state that they were "Kafir" and "Murted," or unbelievers, who can be killed by other Muslims. J.A. 185
 
 
 [2]
 Despite my decision on the merits of the case, I admit to some skepticism as to the amount of damages awarded by the jury. However, the appellee did not file a cross appeal regarding the size of the jury verdict, assuming it were to be reinstated, and the issue is not before this court at this time
 
 
 [3]
 The proximate cause standard used by the district court is not the same as the one articulated in Mt. Healthy. The district court opinion granting JNOV did not indicate the appellee had proven that Al-Zubaidi would have been terminated even in the absence of Ijaz's discrimination. The jury instructions and special verdict form did not phrase the standard in that way, either. To say that Al-Zubaidi was "capable of successfully completing the program" is not the same as saying that Ijaz had proven the program would have terminated Al-Zubaidi even without Ijaz's own discriminatory involvement
 The posture on appeal of any issue regarding the standard used below is unclear. Appellant argues that the district court applied the proper standard. Appellee argues that the district court's phrasing is incorrect, but that the parties waived any claim based on the improper standard by not contesting it below.
 What is clear is that the majority attempts to ignore the error below by indicating the district court "granted JNOV because the evidence clearly did not satisfy the 'but for' test set forth" in Mt. Healthy. Major. op. at 1348. The district court did not make the finding Mt. Healthy requires. Since I would reverse the grant of JNOV and remand for further proceedings, as I indicate below, I would instruct the district court to use the proper standard in considering the matter on remand.
 
 
 [4]
 The thesis committee consisted of Ijaz as chairman and Professors Arndt, Almeida and Gotow. After that committee resigned, the Physics Graduate Committee, consisting of Professors Ficenec, Lee, O'Dell and Williams, met to review Al-Zubaidi's status. Gilmer, the chairman of the physics department, ultimately made the decision to terminate
 
 
 [5]
 Although the majority recognizes that Al-Zubaidi's termination was based on his failure to perform in the laboratory and that his academic performance was adequate, see Major. op. at 1349, the majority tries to bolster its opinion with an evaluation of Al-Zubaidi's academic performance made five years before the actual termination. In attacking Al-Zubaidi's capabilities, the majority quotes extensively from a report by Professor Trower following a course in which Al-Zubaidi was his teaching assistant. Major. op. at 1349. Even if Trower's opinions were correct at that time, after this experience Al-Zubaidi took and passed his second set of preliminary exams, demonstrating his fundamental academic knowledge of the field as a whole. Even the appellee does not challenge Al-Zubaidi's classroom skills, claiming instead that the faculty's decision to terminate Al-Zubaidi was based on his research and laboratory skills. It is difficult to see how the Trower passage adds any support to the majority's ruling
 
 
 [6]
 The majority apparently does not wish to acknowledge that Ijaz actually and intentionally discriminated against Al-Zubaidi on the basis of their religious differences, even though the jury found such discrimination and even though that jury finding is not contested on appeal. The majority grudgingly "admits" that "the evidence indicates that Ijaz was not helpful to Al-Zubaidi once Al-Zubaidi refused to sign Ijaz's petition," and it concedes that Ijaz' actions "could possibly be construed as an act of sabotage against Al-Zubaidi's standing." Major. op. at 1350 (emphasis added)
 I submit that the majority ought to accord appropriate deference to the jury's answer to special interrogatory No. 1 and accept that Ijaz did in fact actually discriminate against Al-Zubaidi. Only then can the court focus on the real issue before it, which is whether that discrimination tainted the subsequent decision to terminate Al-Zubaidi. Even if the majority is skeptical about Al-Zubaidi's potential as a physicist, it should not overlook a clear jury finding of discrimination that is not being challenged on this appeal.
 
 
 [7]
 It is difficult to see how appellee could have met this burden. Not one of the participants on the committees evaluating Al-Zubaidi stated that his decision would have been the same had he discounted Ijaz's participation in these events. The appellee simply did not offer the proper testimony to carry the burden he bears under Mt. Healthy