**Hamid R. KASHANI, Plaintiff,**

v.

**PURDUE UNIVERSITY; The Trustees of Purdue University; Steven C. Beering, as Acting Pres. of Purdue University; Struther Arnott, individually as VP for Research & Graduate Dean of PU; Richard J. Schwartz, indiv.; George R. Cooper, indiv.; Austin L. Shelley, indiv.; Robert F. Pierrett, indiv.; Paul C. Krause, indiv.; and Clare D. McGillem & Robert L. Gunshor, both indiv. and off. cap. as members of Graduate Committee of School of Elec. Engr., Defendants.**

**Civ. No. L83–24.**

United States District Court, N.D. Indiana, Lafayette Division.

April 1, 1991.

---

Richard J. Swanson, William E. Marsh, Indianapolis, Ind., for plaintiff.

John F. Bodle, John C. Duffey, Stuart & Branigin, Lafayette, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This court takes full judicial notice of the record in this case, including the opinion of the Court of Appeals in *Kashani v. Purdue University*, 813 F.2d 843 (7th Cir. 1987), *cert. denied*, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97. Pursuant to the mandate of that reported decision, this case came back to this court, which again held extensive proceedings, more discovery and a three-day bench trial in Lafayette, Indiana. This memorandum is designed to comply with the mandates of Rule 52 of the Federal Rules of Civil Procedure (Fed.R. Civ.P.). This court is well familiar with the extraordinary demands of formality, originality and specificity in this regard. *Andre v. Bendix*, 841 F.2d 172 (7th Cir.1987), *cert. denied*, 488 U.S. 855, 109 S.Ct. 144, 102 L.Ed.2d 116 (1988).

On March 11, 1991, both plaintiff and defendants filed elaborate post-trial briefs on March 11, 1991, which have been carefully examined by this court. Supplemental briefs were filed March 25, 1991, and also have been carefully read.

The plaintiff is a citizen of Iran but has been a resident of the United States since coming to Purdue University as a student in 1976. He retains the status of an alien, and his national origin is Iranian.

A claim is asserted under the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States by and through Title 42 U.S.C. § 1983. The remaining claims are for injunctive relief under Fed.R.Civ.P. 65. This court has jurisdiction under Title 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Declaratory relief is also requested under 28 U.S.C. §§ 2201–2. Specifically, the issue relates to prospective injunctive relief either to reinstate this plaintiff in a doctoral program in the Purdue University Department of Electrical Engineering, or to order the immediate awarding of a doctoral degree.

■ The standards established for the entry of a permanent injunction appear to be substantially the same as for a preliminary injunction. *Chicago & North Western Transp. Co. v. Railway Labor Executives' Ass'n*, 908 F.2d 144 (7th Cir.1990). There must be a compliance with formalities of Rule 65 and Rule 58 (when an injunction is in fact issued).

■ There is no question that appropriate state action exists and that the officials at Purdue University acted under color of state law. In cases under § 1983 involving educational institutions, federal district courts do not sit as super school-boards. Nor does this court intend to sit as a super doctoral faculty committee in the School of Electrical Engineering at Purdue University.

The evidence in this case is that Purdue University's School of Electrical Engineering is one of the preeminent schools of that kind in this nation and perhaps the world. Its requirements for a doctor of philosophy degree in electrical engineering are demanding in the extreme. It is not for this court to rewrite the criteria for a doctorate in electrical engineering at Purdue University, and it is not for this court to superimpose its most limited and irrelevant scholastic and educational judgments upon those of the educational officials at Purdue University.

■ As a resident alien, the plaintiff is entitled to the benefit of the Equal Protection Clause of the Fourteenth Amendment. However, that generalization is only the beginning. As that clause has been interpreted in cases involving academic requirements at the college or post-graduate level, the plaintiff has the burden to establish intentional discrimination. The plaintiff must establish that he is a member of a suspect class. More than a century ago, the Supreme Court of the United States held out that possibility in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). *See also Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

■ The plaintiff bears the ultimate burden of proving purposeful and intentional acts of discrimination based on his membership in a particular class. Certainly, this court can look to the totality of circumstances which have been explicated in great detail in both oral testimony and the mass of written documents. *Al–Zubaidi v. Ijaz*, 917 F.2d 1347 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991).

Two other preliminary points need to be made. Certainly, juries are regularly instructed that a party to a lawsuit has an interest in the outcome and that may be taken into account by the trier of fact. Certainly, it can be said that the individual defendants who testified had and have an institutional interest in the educational processes and in the processes of awarding the doctorate degree in electrical engineering. For the most part, these witnesses appeared to be careful and thorough in their testimony, and this court found no opportunity to seriously question their credibility. This court also carefully observed the demeanor of this plaintiff during the trial and on the witness stand and at some crucial points, this court entertains serious reservations about his credibility. During the preliminaries and at the trial, this plaintiff proffered evidence of two conversations that were allegedly had between him and Dr. Saridis, then of Purdue University, now of Rensselaer PolyTechnic Institute in the State of New York. That proffer of evidence was offered to prove a smoking gun-kind of discriminatory statement by Dr.

Krause, who categorically denied the same under oath in his testimony, a denial which this court credits. Notwithstanding that arrangements were made to take depositions of persons formerly connected with Purdue University at distant locations preliminary to this trial, the testimony of Dr. Saridis was neither sought nor offered. The court then and now expressed extreme reservations about letting this double hearsay testimony in through the mouth of the plaintiff without the corroboration of Dr. Saridis.

After a highly successful undergraduate career, and after receiving a Master of Science degree in electrical engineering in 1979, the plaintiff began to pursue a doctoral degree in electrical engineering in the School of Electrical Engineering in January 1980. The plain and blunt fact is that this plaintiff twice failed the critically important Ph.D. examination. This failure must be folded in to the inability of the plaintiff to muster strong support from his major professor, Dr. Saridis, and his declining class rankings in graduate courses. His doctoral program was terminated in February 1981, and this case was originally filed on February 18, 1983. In the interim since February 1981, this plaintiff has completed a law degree.

It is a historical fact which this court knows from the record in this case, as well as from judicial knowledge of contemporary history, that on the 4th day of November, 1979, hostages were taken at the American Embassy in Tehran, Iran, a crisis which attracted continuous worldwide attention until their release on Inauguration Day, January 20, 1981. Over a period of time there were several other Iranian students in the School of Electrical Engineering at Purdue University obtaining B.S. E.E., M.S.E.E. and Ph.D. degrees. A segment of the plaintiff's trial testimony is revealing:

Q. At no point in the review process before the Review Committee in September of 1980 or in February of 1981 or before the Graduate Committee in July of 1981 did you ever emphasize as extenuating circumstances the political events occurring in Iran with the hostage crisis, did you?

A. No.

Q. You say you did emphasize them and stress those points to the committee?

A. Stressing them in what way? *Making a big deal of them, no.* But discussing them and referring to them as an explanation for why my grades dropped below 6.0, yes.

Q. If I may direct your attention, Mr. Kashani, to your deposition which is before you there at page 104. Were you asked this question and did you answer this way:

Question: You chose not to rely upon or to emphasize any extenuating circumstances during your first appearance before the Ph.D. Review Committee?

*I didn't emphasize it, no. I didn't want to give an appearance to imply that I wanted mercy.*

Is that what I asked you and is that how you answered?

A. Yeah. I'm sure that's what I answered with respect to that question.

Q. And, again, on pages 118 and 119 of your deposition, beginning on page 118 at the bottom. The last question was as follows and did you answer it this way:

Question: Was the focus of your statement of presentation to the committee the distracting affect of the situation in Iran or rather the particular question which you perceived to be inappropriate that was on the exam?

Answer: No. It mostly was emphasized with my research—research publications.

Is that how you answered?

A. Yeah. That was not the focus of my presentation to them. (emphasis added)

This court finds categorically that this plaintiff did *not* raise the question of the effect of the so-called hostage crisis to excuse his failing the doctoral examination. The plain and blunt fact is that such was an afterthought. This is *well*-supported by the plaintiff's written statements to the

Review and E.E. Graduate Committees. Defendants' Exhibits U–1 and EE and trial record, pps. 142–43.

▮▮▮ Much of the plaintiff's evidence in this case focused on that historical event as it subjectively affected this plaintiff. However, the record in this case indicates that the reliance on the Iranian crisis for his inability to pass the Ph.D. examination and as a basis for explaining lowered grades is basically an afterthought. It has much of the earmarks of an afterthought of a plaintiff who, in the interim, was in the process of obtaining a law degree. Additionally, school officials in a highly sophisticated academic discipline are entitled to a presumption of honesty and integrity, unless actual bias, such as personal animosity, illegal prejudice or a personal or financial stake in the outcome, can be established. *See Ikpeazu v. University of Nebraska,* 775 F.2d 250 (8th Cir.1985).

In the specific context of higher education, the Supreme Court of the United States, speaking through Justice Stevens, has stated:

> When judges are asked to review the substance of a genuinely academic decision...., they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225–26, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985). In *Regents,* Justice Powell's current concurring opinion is also highly revealing. He stated:

> I agree fully with the court's emphasis on the respect and deference that courts should accord academic decisions made by appropriate university authorities. In view of *Ewing's* academic record, that the court charitably characterizes as 'unfortunate,' this is a case that never should have been litigated. After a four-day trial in a district court, the case was reviewed by the Court of Appeals for the Sixth Circuit, and now is the subject of a

decision of the United States Supreme Court. Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed....

474 U.S. at 230, 106 S.Ct. at 516. *See also Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Haberle v. University of Alabama in Birmingham,* 803 F.2d 1536 (11th Cir.1986); and *Fong v. Purdue University,* 692 F.Supp. 930, 935 (N.D.Ind.1988). This court is also well aware of the decision of Judge Easterbrook sitting in this district as reflected in *Bohen v. City of East Chicago, Indiana,* 799 F.2d 1180 (7th Cir.1986), in which the equal protection focus does not demand proof of a discriminatory policy against an entire class, but rather demands proof of discrimination against the plaintiff *because* of membership in a suspected class.

There can be no doubt that as a part of the human equation of securing a doctorate in a highly sophisticated discipline such as electrical engineering, that students pursuing the same can and will confront a wide range of subjective human trauma. In this specific academic context, the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States is not a straitjacket to which the standards for such an advanced degree must be forced. Indeed, it can well be argued in this academic context objective academic criteria can be established that completely ignore such unusual human trauma. *Hankins v. Temple University,* 829 F.2d 437 (3rd Cir.1987); *Al–Zubaidi v. Ijaz,* 917 F.2d 1347 (4th Cir.1990); *Mauriello v. University of Medicine and Dentistry of New Jersey,* 781 F.2d 46, 51 (3rd Cir.1986), and *Ikpeazu v. University of Nebraska, supra.*

The demographics of both the faculty and student body of the school of electrical engineering at Purdue University belie any institutional effort to discriminate on the basis of national origin. This court does not understand this plaintiff to be now

making an equal protection attack on the facial fabric of the Ph.D examination. Any such effort would be misguided since the examination, admittedly very tough, does not in any way indicate that it is somehow deficient under the Equal Protection Clause.

This court heard and has considered the array of comparative evidence as between this plaintiff, a Mr. Parvin and a student Doe. While one might argue for different academic decisions as among these three doctoral candidates, this record completely fails to disclose any basis for intentional discrimination by any of the officials at Purdue University as against this plaintiff. While the procedures involved were evolutionary, subject to re-examine and change, they were not violative of the Equal Protection Clause of the Fourteenth Amendment. There were abundant procedural protections and safeguards imbedded in the process by which this plaintiff was excluded.

There is no evidence that the officials at Purdue University ever excused any doctoral candidate in electrical engineering from taking the doctrine examination which this plaintiff failed twice. It is not for this court to re-write that examination or to require its waiver in this case. The Equal Protection Clause demands neither act. It takes much more than national outrage during the hostage crisis of 1979–81 to prove intentional discrimination here and this plaintiff has failed his burden in that regard.

Some time ago, in *Andre v. Bendix, supra,* a discussion was had with regard to this court's so-called "hunch" that sexual discrimination, in that case, existed. Whatever may have been the situation there, here this court is without any "hunch" at all that a discriminatory violation of the Equal Protection Clause exists or has been established. Measured by the formal demands of *Andre,* this court concludes that there is no basis for the granting of an injunction under Fed.R.Civ.P. 65.

The intent is to now enter a final appealable judgment in this case DENYING any injunctive relief to the plaintiff and entering a judgment for the defendants. The Clerk shall enter such a judgment. Costs are assessed against the plaintiff and in favor of the defendants. IT IS SO ORDERED.