Thu McGILL, Appellee,

v.

George MUÑOZ, President and Chief
Executive Officer, Overseas Private
Investment Corporation, Appellant.

No. 97–7123.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 15, 1999.

Decided Feb. 18, 2000.

Morgan D. Hodgson argued the cause for appellant. With her on the briefs was Shannen W. Coffin.

Thu Minh McGill, appearing pro se, argued the cause and was on the brief for appellee.

Joanne Zimolzak, appointed by this court, argued the cause as amicus curiae on the side of appellee. With her on the brief was Tami Lyn Azorsky.

Before: WILLIAMS, ROGERS, and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

Plaintiff Thu McGill filed suit against her former employer, the Overseas Private Investment Corporation (OPIC), alleging, inter alia, that OPIC discriminated against her in violation of the Rehabilitation Act. The district court denied OPIC's post-trial motion for judgment as a matter of law on that claim, and OPIC appealed. We hold that because McGill failed to offer evidence from which a reasonable jury could have concluded that OPIC discriminated against her, the decision of the district court must be reversed.

## I

OPIC is a federal agency established by Congress to "facilitate the participation of United States private capital and skills in the economic and social development of less developed countries." 22 U.S.C. § 2191. McGill was employed there as a secretary in the Department of Legal Affairs. On October 18, 1995, she sued her employer, citing violations of two statutes. First, she alleged that OPIC discriminated against her on the basis of her race and national origin, and retaliated against her for making discrimination complaints, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Second, she alleged that OPIC discriminated against her on account of her disability (depression), and failed to reasonably accommodate that disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq.

The district court granted OPIC's motion for summary judgment against McGill on all of the Title VII claims. Plaintiff proceeded to trial on the remaining Rehabilitation Act claims and secured a $75,000 verdict. After trial, the court granted OPIC's motion for judgment as a matter of law against McGill on the reasonable accommodation claim, but denied OPIC's motion for judgment as a matter of law on the disability discrimination claim. Because the jury had not apportioned the recovery between the two claims, the court let McGill's $75,000 judgment stand. See McGill v. Callear, 973 F.Supp. 20, 23–24 (D.D.C.1997).

Both McGill and OPIC appealed. A prior panel of this court rejected McGill's appeal, affirming both the order granting OPIC summary judgment against her on the Title VII claims, and the order granting judgment as a matter of law against her on the reasonable accommodation

claim. *See McGill v. Munoz*, 172 F.3d 920 (D.C.Cir.1999) (unpublished table decision). OPIC's appeal was then set for argument. Although McGill was represented by counsel at trial, she appealed pro se, and we appointed an amicus curiae to present arguments on her behalf.[1] We now decide the sole remaining issue: whether the district court improperly denied OPIC's motion for judgment as a matter of law on the claim of disability discrimination under the Rehabilitation Act.

## II

■ We review de novo a trial court's denial of a motion for judgment as a matter of law. *See Duncan v. Washington Metro. Area Transit Auth.*, 201 F.3d 482, 485 (D.C.Cir.2000). We do not, however, lightly disturb a jury verdict. Judgment as a matter of law is appropriate only if "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not" have reached a verdict in plaintiff's favor. *Id.* (quoting *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C.Cir. 1999) (internal quotation omitted)).

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination under any program or activity . . . conducted by any Executive agency . . . ." 29 U.S.C. § 794. Thus, assuming without deciding that McGill is an "otherwise qualified individual with a disability," we may uphold the jury's verdict only if McGill proved that she was subjected to discrimination "by reason of her disability." *Id.*; *see Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C.Cir.1999).

■ A plaintiff may always prove a claim of discrimination by introducing direct evidence of discriminatory intent. As an alternative, when the defendant denies its actions were motivated by the plaintiff's disability, the plaintiff may employ the *McDonnell Douglas* burden-shifting framework to bring her Rehabilitation Act claim before a jury.[2] *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir.1998) (en banc); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993); *see also Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1099–1100 (D.C.Cir.1997). Once a case has been fully tried on the merits and submitted to the jury, however, the *McDonnell Douglas* framework "drops from the case" and only the ultimate question remains: "[whether] the defendant intentionally discriminated against the plaintiff." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (alteration in original); *accord St. Mary's*

---

1. For purposes of this opinion, we will attribute to McGill arguments made either by her or by amicus.

2. The Supreme Court has described the *McDonnell Douglas* framework as follows:

   First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

   . . .

   The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

   *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) (citations omitted). In *Barth*, we noted the applicability of this framework, originally developed for actions brought under Title VII, to claims of disability discrimination under the Rehabilitation Act. *See Barth*, 2 F.3d at 1186.

*Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1554 (D.C.Cir.1997).[3] On appeal, that question undergoes further refinement: we ask only whether a reasonable jury could have found such intentional discrimination. *See Swanks,* 179 F.3d at 933; *Mungin,* 116 F.3d at 1554.

At trial, McGill alleged that OPIC discriminated against her in two respects during the summer of 1994. First, she was required to make up time she took off from work to participate in an aerobics class. Second, she was required to submit medical documentation when she used sick leave credits for absences from work.[4] We apply the legal analysis set forth above to each of these allegations.

## A

■ At some time prior to January 1994, McGill began taking part in a midday aerobics class conducted on OPIC's premises. In July of 1994, McGill's supervisors became concerned that she was spending an inordinate amount of time away from her desk, particularly at lunchtime. McGill explained that, in addition to the authorized lunch break, she needed an extra half hour to shower and dress after the aerobics class. In response, McGill's supervisors advised her by memorandum that she would be permitted to take "one and one-half hour" off for the class, but would have to "make up the extra half hour" that was "beyond the time provided for lunch." Pl.'s Ex. E (J.A. at 49).

McGill contends that OPIC discriminated against her on account of her mental disability by requiring her to make up the extra half hour. Lacking any direct evidence of discriminatory intent, McGill argues that OPIC's intent can be inferred from its disparate treatment of her; she asserts that other, similarly-situated employees who participated in the same class did not have to make up any time.[5] Yet, while there was testimony that numerous employees attended the aerobics class, which lasted forty minutes, no witness testified that any employee other than McGill took more than the allotted lunch hour to return to work.

McGill's argument that others were treated more favorably than she reduces to an argument that others "must" have taken off more than just the lunch hour. For this, plaintiff relies on testimony by Frederick Jenney, one of her attorney supervisors, who stated that "it could take an hour-and-a-half" for someone "to take an aerobics class and get showered and everything in the middle of the day." J.A. at 763. But Jenney's speculation that it "could" take an hour-and-a-half is not evidence that it "did" take anyone—other than plaintiff—that long. *See Brown v. Brody,* 199 F.3d 446, 458–59 (D.C.Cir.1999) (holding speculation insufficient to avoid summary judgment); *Al-Zubaidi v. M.A. Ijaz,* 917 F.2d 1347, 1348 (4th Cir.1990) (holding that "mere speculation is insufficient" to support a jury verdict) (internal quotation omitted). Indeed, immediately after the above-quoted remark, Jenney testified that he knew of no one else in the

3. Although plaintiff is correct in noting that the elements of a "prima facie case" may vary depending upon the circumstances of the allegations, *see Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. 1089, the plaintiff's "ultimate burden" is always to prove "that she has been the victim of intentional discrimination," *id.* at 256, 101 S.Ct. 1089.

4. These are the only two examples of discriminatory treatment discussed in the brief of amicus curiae. The district court noted that "[p]laintiff also testified about training opportunities but the record does not reflect a colorable claim of disparate treatment on that

basis." *McGill,* 973 F.Supp. at 22 n. 2. We agree, and reach the same conclusion regarding other claims raised in plaintiff's pro se brief but not mentioned by either the district court or amicus.

5. *Cf. Holbrook v. Reno,* 196 F.3d 255, 261 (D.C.Cir.1999) (noting that "[t]o establish a prima facie case under the *McDonnell Douglas* framework, [plaintiff] must demonstrate (1) that she is a member of a protected class; (2) that she was similarly situated to an employee who was not a member of the protected class; and (3) that she and the similarly situated person were treated disparately").

department who did take an hour-and-a-half off to attend the class. *See* J.A. at 765. The time taken by McGill, he said, "was an unusual situation." *Id.* The only other evidence in the record is to the same effect. *See* J.A. at 458 (testimony of office manager Connie Downs, stating that OPIC "just didn't have problems with other people being away for such a long period of time").[6]

In sum, because plaintiff failed to offer any evidence that she was treated unfavorably compared to other employees,[7] and because she offered no other evidence of discrimination, we find that no reasonable jury could have concluded that the compensatory time requirement was the product of intentional discrimination.

## B

■ McGill also contends that OPIC discriminated against her by requiring her to provide a doctor's note for absences from work for which she sought to use sick leave. Relying once again on indirect evidence of discriminatory intent, McGill asserts that office policy did not require documentation for such absences, and thus that OPIC's claimed reliance on such policy was pretextual.[8]

OPIC's written policy defines "sick leave" as "a period of approved absence with pay from official duty," which is authorized only in limited circumstances, including "[w]hen the employee is unable to satisfactorily perform the assigned duties because of sickness [or] mental illness." J.A. at 308. The policy states that it is the supervisor's responsibility to determine "that the nature of the employee's illness was such to incapacitate him for his job," and provides that "[a] medical certificate signed by appropriate medical authority is generally required for sick leave exceeding 3 days duration." *Id.* Because McGill was never absent for more than three days at a time, she contends that OPIC violated its policy by requiring written documentation.

In fact, there is no evidence that OPIC violated its sick leave policy. That policy does not end with the passages quoted above. It also includes the following procedures for dealing with the apparent abuse of sick leave:

> When the employee appears to be using sick leave improperly (for example, chronic use of brief periods of sick leave), the employee may be required to comply with special leave procedures more stringent than those applied to other employees. For example, *the employee may be required ... to provide evidence to substantiate brief periods of illness.* An employee who is being placed on leave restriction shall be notified in writing, in advance, of the procedures and their duration. At the end of six months, the employee's record will be reviewed to see if the restrictions can be lifted.

*Id.* (emphasis added). It is this aspect of the policy that OPIC applied to McGill.

In the summer of 1994, McGill's office manager, Connie Downs, noted that McGill

---

6. McGill cites the testimony of secretary Ida Kingsberry as assertedly supporting her claim that none of the other secretaries who participated in the class were required to compensate for extra time away from their desks. *See* McGill Br. at 8, 11; Amicus Br. at 44–45. Kingsberry, however, did not testify that she (or any of the others) took off more than the lunch hour. To the contrary, Kingsberry testified that she "d[id] not ... think that Thu McGill was treated less favorably than others" in the department. J.A. at 375.

7. *See Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (holding plaintiff failed to demonstrate disparate treatment because she failed to show she was similarly situated to co-worker to whom she compared herself).

8. *Cf. Aka,* 156 F.3d at 1289 (noting that one form of evidence from which a jury may be able to infer discriminatory intent is "evidence the plaintiff presents to attack the employer's proffered explanation for its actions"); *id.* at 1290 n. 5 (noting that the "sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case") (quoting *Fisher v. Vassar College,* 114 F.3d 1332, 1338 (2d Cir.1997) (en banc)).

had missed work five times in a one-month period. The absences conformed to a clear pattern—each time McGill received a poor performance appraisal, she took off the following one or two days of work. *See id.* at 59, 409. Responding to what appeared to her to be an abuse of sick leave, Downs sent McGill a memorandum, entitled "Special Leave Procedures." *Id.* at 59. The memo advised McGill that her "pattern" of leave "raise[d] a question about whether you are using sick leave for the purposes for which it is intended," and therefore "warrant[ed] special leave procedures." *Id.* at 59–60. Pursuant to OPIC's written policy, which was quoted in the letter, Downs instructed McGill that she would be required to provide a physician's certificate when she wanted to take sick leave for future absences. *See id.* at 60. The memorandum also notified McGill that the requirement would be reviewed in six months to determine whether it could be rescinded. *See id.*

As Downs' memorandum fully complied with the written sick leave policy set forth above,[9] there is no evidence to support McGill's contention that it was mere pretext. Nor did McGill furnish other evidence of intentional disparate treatment—or, for that matter, of disparate treatment at all. McGill offered no evidence that employees with similarly suspicious patterns of absenteeism were treated any differently than she was. *See Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (finding that terminated employee failed to show

that retained employee had similar difficulty in getting along with others in the firm). In fact, McGill offered no evidence that employees with a similar frequency of absenteeism—whether suspicious or not—were treated any differently. *See Mungin,* 116 F.3d at 1554, 1558 (overturning jury verdict where plaintiff failed to show that employer's explanation for his treatment was pretextual, or that similarly-situated colleagues were treated more favorably).

In short, McGill offered no evidence—either direct or circumstantial—from which a reasonable jury could have concluded that OPIC imposed the medical documentation requirement because of her disability.

## III

For the foregoing reasons, we conclude that no reasonable jury could have found that OPIC intentionally discriminated against McGill. We therefore reverse the order denying in part OPIC's motion for judgment as a matter of law, and remand the case for entry of judgment for defendant. *See Mungin,* 116 F.3d at 1558; *see also Scott v. District of Columbia,* 101 F.3d 748, 760 (D.C.Cir.1996) (reversing and remanding when "the facts, viewed in the light most favorable to [plaintiff], indicate that he cannot recover on any of his claims").

---

9. McGill contends that a fragment of Downs' trial testimony shows that Downs did not act in compliance with OPIC's policy, which expressly permits sick leave for both physical and mental illness. Although at one point Downs did testify that she doubted McGill's need for leave because McGill "didn't appear ... physically sick," J.A. at 410, in context it

is clear that Downs was distinguishing between real and feigned illness, rather than between kinds of illnesses. *See, e.g., id.* ("[T]he question is whether you're using sick leave for actual sick leave, or whether you're just using sick leave for leave that you just want to take.").