Marcia **CHEDICK**, Appellee/Cross–Appellant,

v.

Thomas **NASH** and Capital City Mortgage Corporation, Appellants/Cross–Appellees.

Nos. 97–7096 and 97–7151.

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1998.

Decided Aug. 7, 1998.

Rehearing Denied Sept. 22, 1998.

---

Eric J. Sanne argued the cause and filed the briefs for appellants/cross-appellees.

Marcia K. Docter argued the cause and filed the brief for appellee/cross-appellant.

Before EDWARDS, Chief Judge, HENDERSON, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

BUCKLEY, Senior Judge:

Capital City Mortgage Corporation and its president and sole shareholder, Thomas K. Nash (collectively "Capital City"), appeal a jury's verdict that they defrauded Marcia Chedick. Ms. Chedick, in turn, contests the district court's decision to bar some of her testimony supporting punitive damages. Both parties contend that the district court committed error in computing compensatory damages for fraudulent misrepresentation. We affirm the judgment but vacate the compensatory damage award and remand for reconsideration of those damages.

I. BACKGROUND

A. Facts

On May 24, 1994, Ms. Chedick sought a loan from Capital City in order to refinance

the mortgage on property she owned at 1013 U Street, N.W., Washington, DC. Ms. Chedick had bought the property in exchange for cash and the assumption of a note. At the time she approached Capital City, Ms. Chedick was in arrears on the note, and a foreclosure sale had been scheduled for May 26.

Both parties agree that Ms. Chedick reviewed Capital City's loan documents only cursorily before initialing them and taking them home. Two days later, she received $42,000 from Capital City that she used to retire the note and to pay back taxes on the property. Prior to settlement, Ms. Chedick neither read the loan documents nor asked any questions about them.

Capital City specializes in lending money to high risk borrowers, on concomitantly onerous terms. In Ms. Chedick's case, the interest rate on the five-year mortgage was 20 percent per annum for the first four years and 30 percent for the final year. If a payment was more than 45 days late, the mortgage was considered in default and the interest rate immediately rose to 30 percent, where it stayed for the remainder of the life of the loan. The note also specified various fees, including a 15 percent "late charge" on payments more than ten days in arrears, a five percent reinstatement fee, and a one percent per month penalty if the property was uninsured by the owner—regardless of whether it had been insured by Capital City.

In August 1994, a disagreement arose over the amount that Ms. Chedick owed on the mortgage, a dispute which remained unresolved a year later. Capital City concedes that the amount it then claimed to be due included improper charges. Ms. Chedick made no payments in the interim, although she states that she proffered two monthly payments that Capital City declined to accept on the ground that they were insufficient. In 1995, Ms. Chedick found a buyer for the property and sought to pay off the entire balance of her outstanding debt to Capital City from the anticipated proceeds of the sale. Capital City allegedly demanded payment of $98,000 to retire the loan, which Ms. Chedick claimed was exorbitant and refused to pay. As a result, the sale fell through.

Ms. Chedick retains title to the property, subject to Capital City's lien.

B. Procedural Background

Ms. Chedick filed for personal bankruptcy in 1994. During the course of the Chapter 13 proceeding, she filed a claim against Capital City alleging breach of contract and fraud. Ms. Chedick demanded a jury trial, and Capital City objected. The case thereupon was transferred to the district court. *See* 28 U.S.C. § 157(e) (requiring parties' consent for bankruptcy court to conduct jury trial).

After proceedings before a magistrate judge, who memorialized his decisions in a pretrial order, *see* Fed.R.Civ.P. 16(e), the case went to trial on Ms. Chedick's claims of fraud, misrepresentation, and breach of contract. Upon finding that Capital City had breached its contract with Ms. Chedick and had defrauded her, the jury awarded her $35,000 for breach of contract, $123,097.85 for fraud, and $100,000 in punitive damages. The $35,000 award compensated Ms. Chedick for her lost profit on the sale of the property and for various charges that she had incurred in the interim. The amount of the compensatory award for fraud was exactly the same as the amount Capital City claimed to be due on May 15, 1996. The court entered judgment against Capital City for $258,097.85.

Capital City filed a motion for "partial new trial and/or for remittitur." In its motion, Capital City claimed that, for various reasons, the jury's award of compensatory damages for fraud was improper. The district court held, however, that Ms. Chedick had presented sufficient evidence to sustain the jury's finding of fraud and that the damages it awarded her were supported by the record. The court also offset the damage award by $42,000, the principal amount of the loan.

Capital City timely appeals the district court's instructions concerning the elements of fraud, and the sufficiency of the evidence supporting a finding of fraud. Ms. Chedick cross-appeals the district court's exclusion of evidence concerning attorneys' fees and emotional damages. She also contests the district court's $42,000 offset.

The district court had subject matter jurisdiction over this case under 28 U.S.C. §§ 157(a), (e) & 1334, and we exercise appellate jurisdiction pursuant to 28 U.S.C. § 1331. The parties are not diverse, and all relevant events occurred in the District of Columbia. D.C. law therefore governs. *See District of Columbia v. Coleman,* 667 A.2d 811, 816–18 (D.C.1995).

## II. ANALYSIS

### A. Capital City Appeal

We address two of Capital City's arguments on appeal: (1) that the district court erred in instructing the jury that the breach of an implicit contractual representation may be tortious and (2) that Ms. Chedick failed to offer any evidence supporting detrimental reliance on Capital City's misrepresentation. Because we uphold the jury's verdict of fraud, we need not address Capital City's claim that punitive damages may not be awarded on the basis of a breach of contract alone.

#### 1. *Promissory Misrepresentation*

■ Fraudulent misrepresentation requires proof of "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co., Ltd. v. Shama Restaurant Corp.,* 613 A.2d 916, 923 (D.C.1992). To prevail, the plaintiff must also have suffered some injury as a consequence of his reliance on the misrepresentation. *See Dresser v. Sunderland Apartments Tenants Ass'n, Inc.,* 465 A.2d 835, 839 (D.C.1983).

■ Although an erroneous *forecast* of an event's future occurrence is not actionable in tort, where a promisor misrepresents his *present* intent to perform an act in the future, the promisee may state a claim for tortious misrepresentation. In *Bennett v. Kiggins,* 377 A.2d 57 (D.C.1977), the D.C. Court of Appeals explained the distinction:

> When a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud. On the other hand, a prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence.

*Id.* at 61. Because the alleged tortfeasor must have misrepresented either his current intent to perform or his existing knowledge concerning the likelihood that an event would occur in the future, the tort of promissory misrepresentation is consistent with the general rule that an erroneous representation of future events is not tortious. *See* 37 Am. Jur.2d, Fraud and Deceit, § 68 (1968) ("The gist of the fraud in such cases is not the breach of the agreement to perform, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the obligee by such false promise."); Restatement (Second) of Torts § 525 (1976) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."); *see also Fraud,* 37 C.J.S. § 15, at 195 (1997).

■ Ms. Chedick argued at the trial and repeats on appeal that, consistent with its practice, Capital City intended to prevent her from repaying her mortgage so that it could foreclose on her property and that she would not have signed the note had she known that Capital City would seek to frustrate her performance. Chedick Complaint at ¶ 46. In support of her claim, Ms. Chedick relied upon evidence that Capital City repeatedly miscalculated her monthly obligation, that it forced her into default by capitalizing costs that should have been assessed as separate fees, that its conduct was consistent with how it had treated other customers (after which it had foreclosed on them), and that it significantly overestimated the amount required to pay off the mortgage (thereby scuttling a sale that would have precluded it from obtaining the property through foreclosure).

At the close of the trial, the court instructed the jury that

[t]he general rule is that an action for fraud can exist only if there was a misrepresentation of a past or existing fact, not a promise to do something in the future. But a promise made with an existing intention not to perform, that promise can be a fraudulent misrepresentation. In this case, you must find on the first element of the claim of fraud by a clear and convincing evidence that Capital City ... entered into the promissory note and deed of trust with the intent not to perform.

You must find that Capital City ... had this intention not to perform at the time that the note was entered into or at the time the promissory [note] was made, and this was the time that the note was signed. A breach of the term of the contract which occurred later cannot alone serve as proof of this intention....

As you know, the plaintiff has tried to show and produced evidence that the amount of the note and the amount of the liability and the debt was accelerated so fast and so high that Capital City ... must have had the intention not to let her ever pay off the note so they could take over the property.

Similarly, in its order denying a new trial, the district court held that

[i]f a party enters into a contract with the express intention not to honor it, his false promise is a fraudulent misrepresentation which can be actionable as fraud....

... Plaintiff argued to the jury that Capital City ... never intended to allow plaintiff to abide by the terms of the agreement, but intended to foreclose on the property from the beginning. The Court finds that this theory fits comfortably within the law regarding promissory fraud.

■ Capital City contends that D.C. law recognizes a cause of action for promissory misrepresentation only when the promise is neither memorialized as an explicit contract term (e.g., an undertaking to provide $42,000 on a date certain) nor implied by law in the contract (e.g., the obligation to act with good faith); in other words, the misrepresentation must be a collateral statement of fact that induced the execution of the contract. Thus

Capital City argues that the district court misinterpreted D.C. law when it instructed the jury (and affirmed in its post-trial order) that the breach of an implicit term of a contract could be tortious. We review the district court's legal instructions *de novo*. *See Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C.Cir.1993).

It is true that no reported D.C. case has held that a mere intent not to perform a contractual duty can give rise to a cause of action sounding in tort. Nevertheless, such a holding is not precluded by any of the cases that have recognized that a misrepresentation of one's intent to perform a collateral commitment might be tortious. *See, e.g., Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706–07 (D.C.1981) (holding that defendant had not committed tort because its agent's collateral comment had been made in good faith); *see also Shear v. National Rifle Ass'n*, 606 F.2d 1251, 1253–54, 1259 (D.C.Cir. 1979) (holding that breach of collateral promise was actionable). Some time ago, we observed in a footnote that "[a] promise or contractual commitment may be actionable as a misrepresentation if at the time of its making the promisor had no intention of carrying it out." *Day v. Avery*, 548 F.2d 1018, 1026 n. 39 (D.C.Cir.1976) (citing William Prosser, *Torts* § 109 at 729–30 (4th ed.1971)). The D.C. courts have neither adopted nor rejected the rule averred to in *Day*. Indeed, our own review of District case law suggests that they have had no occasion to do either, which is not surprising considering that the class of cases to which our comment in *Day* refers is very narrow. The present case, however, falls within *Day*'s limited scope. We must therefore decide whether application of that rule would be consistent with existing D.C. law.

■ To the extent that D.C. courts have spoken to this issue at all, they have not rejected the application to contractual commitments of the general rule that a misrepresentation of one's intent to perform a duty may give rise to a tort. *See Bennett*, 377 A.2d at 61. Despite Capital City's arguments to the contrary, it is clear that D.C. law does not distinguish between a promisor's breach of implicit and explicit contrac-

tual representations. *See Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.,* 431 A.2d 569, 577 (D.C.1981) (treating breach of implicit and explicit contractual obligations in the same manner). It is equally plain that every party to a contract necessarily represents that it intends to perform all its obligations, whether implicit or explicit. *See* Restatement (Second) of Contracts § 1 (1979). The narrow issue before us, therefore, is whether the tort of fraudulent misrepresentation in the District of Columbia includes a cause of action arising from a party's intent not to perform a contractual obligation that it is about to undertake.

D.C. courts have distinguished between a failure to perform such an obligation and a misrepresentation of one's intent to perform. *See, e.g., Urban Invest., Inc. v. Branham,* 464 A.2d 93, 98 (D.C.1983) ("The fact that the repairs were not performed ... does not support a conclusion that appellants, in representing that the repairs would be completed, never intended to carry out the promise."). Similarly, the courts have recognized that material misrepresentations upon which a party relies may generate a cause of action sounding in tort. *See, e.g., Howard,* 432 A.2d at 706. We are confident, then, that if this case were before a D.C. court, it would apply the rule that we suggested in our footnote in *Day*; thus it follows that we find no error in the district court's statement of the law in its jury instructions and in its post-trial order.

*2. Sufficiency of the Evidence Supporting the Elements of Fraud*

■ A jury's "verdict will stand unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict. But the evidence must be more than merely colorable; it must be significantly probative." *Smith v. Washington Sheraton Corp.,* 135 F.3d 779, 782 (D.C.Cir.1998) (internal quotation marks and citations omitted).

■ Capital City contends that no misrepresentation occurred here; and even if one did, that Ms. Chedick failed to prove either that she detrimentally relied on Capital City's implicit representation that it would act in good faith or that its alleged misrepresentation caused any ascertainable damage. Capital City also alleges that there is no contemporaneous evidence that it intended to breach its duty to act in good faith.

While Capital City is correct that Ms. Chedick failed to produce a smoking gun, she did present circumstantial evidence that Capital City intended from the outset to ignore its duty of good faith and fair dealing. By capitalizing closing fees (rather than charging them to her as ancillary expenses), Capital City prematurely caused Ms. Chedick's account to go into default and the interest rate to rise to 30 percent even if she had made the scheduled monthly payments on time. Ms. Chedick also presented evidence that Capital City's practice was to use consistently faulty accounting together with the harsh terms of its notes to confuse and overburden its mortgagees, thereby forcing them into default. The jury was certainly entitled to take this pattern into account in finding that, from the outset, Capital City did not intend to act in good faith.

■ Capital City's remaining arguments derive from the theory that Ms. Chedick (who still retains title to 1013 U Street) could not have been defrauded because she was on the verge of losing the property at the time she entered the loan agreement and would have lost it if she had not secured the Capital City loan. Capital City ignores the fact that, in all likelihood, Ms. Chedick would have been in a better position financially if she had not secured the mortgage, even though it permitted her to retain nominal control over the property.

When she sought to sell 1013 U Street and pay off the Capital City mortgage, the property was valued at $135,000. Capital City, however, claimed a lien of $98,000, leaving Ms. Chedick with a net residual value of $37,000. Thus entering into the mortgage agreement would have harmed Ms. Chedick if her equity prior thereto exceeded that amount.

Ms. Chedick testified that she had purchased 1013 U Street for $100,000 and that in 1994, when she sought the loan from Capital City, it was worth about $120,000. At that

time, Ms. Chedick had a cash investment in the property of $68,000, but owed $32,000 on the original note and $10,000 in back taxes. Thus, if the foreclosure sale had gone through in 1994 and the property been sold for its estimated value, Ms. Chedick would have netted $78,000 ($120,000 minus $42,000 for the note and back taxes), for a profit of $10,000 over her investment. By contrast, if the 1995 prospective sale had materialized, she would have suffered a $31,000 loss ($68,000 less the $37,000 she would have netted from it).

■ We conclude, then, that the record evidence supports both the jury's finding that Capital City misrepresented its intent to perform in good faith and its conclusion that Ms. Chedick suffered injuries as a result of her signing the loan agreement in reliance on that misrepresentation. The jury was entitled to find that Capital City's consistent overstatement of the amount due on Ms. Chedick's mortgage, its improper accounting, and the resulting frustration of her efforts to pay down the mortgage breached Capital City's duty to act in good faith and confirmed its intent to ignore that obligation.

B. Ms. Chedick's Cross–Appeal

*1. Exclusion of Evidence Concerning Emotional Distress and Attorneys' Fees*

■ At the trial, the district court prohibited Ms. Chedick from introducing evidence of either the attorneys' fees she had incurred or the mental anguish she had suffered as a consequence of Capital City's conduct. Ms. Chedick contends that she should have been allowed to present both types of evidence in support of her claim for punitive damages. Capital City argues that the district court correctly applied the Rules of Evidence to bar her from introducing such evidence. We review the district court's decision to exclude evidence for abuse of discretion. *See United States v. Clarke,* 24 F.3d 257, 267 (D.C.Cir.1994).

When Ms. Chedick sought to testify about the amount of her attorneys' fees, Capital City objected on the ground that she had not "provided any discovery or any exhibits on

that." The court sustained the objection. Because Ms. Chedick failed to produce documentary evidence in support of her claim, the court's exclusion of her testimony was not an abuse of discretion. *See* Fed.R.Civ.P. 26(a)(1)(C) (mandating disclosure of "a computation of any category of damages claimed by the disclosing party"); Fed.R.Evid. 801(a)-(c), 802 (hearsay).

The district court also sustained Capital City's objection to Ms. Chedick's testifying to her emotional distress. The court stated:

> I'm not going to let you pursue [emotional damages], then. What I will do is ... if early next week you're [Ms. Chedick's counsel] going to find something about emotional damages being recoverable, even though there's no specific claim in the complaint, a separate claim in the complaint about it, I may let you reopen with this plaintiff [Ms. Chedick] to have to go on the witness stand.... But at the moment, I'm sustaining the objection.

Ms. Chedick did not seek to reopen the court's ruling and failed to present any legal arguments in support of her right to present evidence of emotional distress in support of a claim for punitive damages. In her opening appellate brief, however, she argues that emotional damages may be introduced to support a claim for punitive damages. By failing to present those arguments to the district court, Ms. Chedick forfeited her opportunity to present them on appeal. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

■ In her reply brief, Ms. Chedick attempts to defend her right to testify concerning her attorneys' fees and emotional distress by pointing out that these issues were noted in the magistrate judge's pretrial order. *See United States v. Hougham,* 364 U.S. 310, 315, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960) ("That pretrial order, as authorized by Rule 16, conclusively established the issues of fact and law in the case...."); *Smith v. Washington Sheraton Corp.,* 135 F.3d 779, 784 (D.C.Cir. 1998); *Johnson v. Geffen,* 294 F.2d 197, 199–200 (D.C.Cir.1960). Because she made this argument for the first time in her reply brief, it is forfeited. *See McBride v. Merrell Dow & Pharmaceuticals, Inc.,* 800 F.2d 1208, 1211

(D.C.Cir.1986) (holding arguments first raised in reply brief are forfeited). Under the circumstances, the district court's exclusion of Ms. Chedick's testimony concerning these matters was not an abuse of discretion.

### 2. Damage Award

Both Ms. Chedick and Capital City agree that the district court erred when it reduced aggregate damages by $42,000, the amount of the loan, without addressing the value of Capital City's remaining lien on the property. Ms. Chedick seeks to have the computation of the lien remanded to the district court. Capital City claims that no remand is necessary but that we should offer Ms. Chedick the choice between either a judgment of $123,097.85 (which the jury evidently accepted as the amount due on the note) with the property subject to a lien in the same amount or an offset of $123,097.85 against the original jury verdict with the property free and clear of the lien. Because Capital City did not file a cross-claim for enforcement of its lien, that remedy is not properly before us, and we decline to consider that element of Capital City's argument.

The jury apparently awarded Ms. Chedick $123,097.85 on the basis of her exhibit XXX, which was a Capital City ledger statement indicating that she owed that amount on the mortgage as of May 15, 1996. At the trial, however, Capital City's attorney claimed that $97,000 was sufficient to cover the principal and interest due on the note, as well as taxes and insurance and foreclosure costs. While it is apparent that the jury intended to award Ms. Chedick the amount then owing on the note, there appears to be some question as to what was actually owed. We therefore vacate the award of compensatory damages for fraud and remand it to the district court for a determination of the amount due on the mortgage. As there is no dispute that Ms. Chedick received $42,000 from Capital City at the outset, she has had the benefit of that payment. Therefore, in awarding compensatory damages on remand, the district court should again subtract $42,000 from what it finds to have been due.

### III. Conclusion

The district court's legal instructions to the jury were correct, and the jury's verdict is consistent with the evidence presented at the trial. The verdict is therefore affirmed. Because the basis for it is uncertain, we vacate the $123,097.85 award of compensatory damages for fraudulent misrepresentation and remand to the district court for further consideration.

*So ordered.*