165 F.3d 69
 78 Fair Empl.Prac.Cas. (BNA) 1836,
74 Empl. Prac. Dec. P 45,724, 334 U.S.App.D.C. 124
 JoAnn CARPENTER, Appellant,
v.
FEDERAL NATIONAL MORTGAGE ASSOCIATION, Appellee.
 No. 97-7201.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 19, 1998.
Decided Jan. 22, 1999.
 
 Appeal from the United States District Court for the District of Columbia (No. 96cv02399).
 Nicholas H. Hantzes argued the cause for appellant. With him on the briefs were Kenneth M. Robinson and Dennis M. Hart.
 Juanita A. Crowley argued the cause for appellee. With her on the brief was John Payton.
 Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 JoAnn Carpenter alleges that her employer, Federal National Mortgage Association ("Fannie Mae") discriminated against her on account of her sex in promoting a male colleague rather than herself, and thus violated the District of Columbia Human Rights Act, D.C.Code §§ 1-2512 et seq. The District Court granted summary judgment in favor of Fannie Mae, and Carpenter appeals.
 
 
 2
 Although much of the evidence in the record on summary judgment is documentary, the parties draw from it radically different lessons. As Fannie Mae sees the case, the promotion decision was simply one of merit. As Carpenter sees it, the evidence of meritocracy is no more than a facade, erected to cover up high-level male management's true purpose--to respond to her efforts in favor of a company policy restricting fraternization and thus more effectively preventing sex discrimination in the form of sexual harassment. The district court found that Fannie Mae had presented evidence of a legitimate non-discriminatory reason for its decision, and that a reasonable jury could not draw from plaintiff's evidence the inference that Fannie Mae's reasons were in fact pretextual. Thus it granted summary judgment. On the view we take of the case, this assessment is unnecessary. Because the evidence on which Carpenter relies makes out a case of ideological rather than sex discrimination (if anything), a jury could not properly hold Fannie Mae liable.
 
 I.
 
 3
 JoAnn Carpenter has served as a vice president and deputy general counsel in Fannie Mae's legal department since 1987. In July 1996, as part of a reorganization of its legal department, Fannie Mae decided to promote one of its vice presidents to a new supervisory and management role. Senior Vice President Anastasia Kelly, who had joined Fannie Mae in 1995, was to delegate some of her existing management duties to this new "super vice president." Fannie Mae selected Joseph Biegel instead of Carpenter for this role.
 
 
 4
 According to Fannie Mae, Kelly chose Biegel after she considered all of the other vice presidents in the Office of General Counsel. Instead of using past evaluations, she relied on her own experience with the vice presidents over her year-long tenure at Fannie Mae. She says in her deposition that she looked at everyone who worked for her and chose a lawyer who had strong interpersonal and communication skills. After she had selected Biegel, she consulted the other Senior Vice President, Anthony Marra, who agreed with her decision. Together they proposed the appointment in memoranda to Executive Vice President and General Counsel Robert Zoellick, President and Chief Operating Officer Larry Small, and Chairman and Chief Executive Officer James Johnson.
 
 
 5
 Carpenter does not seriously attack the proposition that Fannie Mae put on a case of a legitimate, non-discriminatory reason for its decision. Her argument is that a jury might conclude that it was invented simply to conceal the real story. That story has three essential elements. First, she says she actively favored an anti-fraternization policy that was anathema to high-level male management. Second, because of her anti-fraternization views male management as early as 1994 preselected Biegel and eliminated her as a candidate. Third, they concocted all the criticisms of her in her evaluations to cover up their discriminatory motives, and made their decision appear to be that of Kelly, who was in fact only a "pawn of the male upper management."[1]
 
 
 6
 Carpenter claims that in the latter part of 1993 she heard that a male supervisor, known for these purposes as Mr. Doe, was having an affair with an employee he supervised. She believed that any sexual relationship between a male officer and a female subordinate (or vice versa) should be investigated because of the possibility of sexual harassment. In early 1994 she evidently suggested to Fannie Mae's Business Code of Conduct Committee (of which she was a member) the desirability of an anti-fraternization policy. To her recollection, there was no opposition to her proposal and it was later adopted.
 
 
 7
 Carpenter's contention that this proposal and her anti-fraternization views generally were anathema to high-level male management rests on an exchange with Marra in 1996 after Biegel's promotion. At the close of a discussion about Fannie Mae's reorganization, Carpenter said in a deposition, Marra asked "how are things going with [Mr. Doe]?" Carpenter contends that this reference to the Doe matter in a discussion about the reorganization of Fannie Mae suggests that the decision not to promote her was linked to her anti-fraternization views. From the inference of opposition to her views she draws the further inference that Biegel was preselected and that the formal numerical evaluation and the informal notes were pure camouflage.
 
 
 8
 And to show that Kelly was only a "pawn" of the males she points to an e-mail message from Biegel to Small in which Biegel thanked Small for his selection, and to admissions allegedly made by Kelly to Carpenter. These "admissions," said by Carpenter to support all elements of her theory, occurred in a meeting between Carpenter and Kelly on September 6, 1996, after Carpenter complained to both Kelly and Marra that Biegel's promotion manifested sex discrimination. Carpenter recounted in a deposition that when she told Kelly about her grievances, Kelly "responded, ... saying, I wish I could tell you you're crazy, but you're not. And then she added, Other people are." "She mentioned that if she were in my position, she would feel the same way, and she prefaced that with, Between us girls." Carpenter said Kelly asked her "if there was anything Fannie Mae could do to mitigate the damage," and specifically offered her stock options.
 
 II.
 
 9
 Once the defendant offered credible evidence of a reason for the promotion decision that was free of sex discrimination, Carpenter could defeat the defense motion for summary judgment only by offering direct or indirect evidence of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In interpreting its Human Rights Act the District of Columbia also follows this formula, Arthur Young & Co. v. Sutherland, 631 A.2d 354, 361 (D.C.1993), and generally seems ready to accept the federal constructions of Title VII, given the substantial similarity between it and the D.C. Human Rights Act. Id. at 361 n. 17. Indirect proof can take the form of evidence from which a jury could find that Fannie Mae's stated reasons for selecting Biegel were pretextual. Hicks, 509 U.S at 511, 113 S.Ct. 2742. Usually such undermining evidence will be enough to get a plaintiff's claim to a jury. Aka v. Washington Hospital Ctr., 156 F.3d 1284 (D.C.Cir.1998) (en banc). This is not always the case, however. "[I]n some instances, ... the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination." Id. at 1291.
 
 
 10
 This is one such instance. Sometimes an employer may offer a meritocratic or otherwise high-sounding explanation for a decision intending to cover up an unsavory reason--but one that is not illegal under the antidiscrimination laws. If the plaintiff explodes the phony reason with evidence that simply supports an unsavory but lawful alternative reason (or, more technically, offers evidence from which a jury might find such to be the true reason), the plaintiff cannot get to the jury. "If a plaintiff shoots himself in the foot, surely there is no point in sending the case to the jury." Aka, 156 F.3d at 1291. Thus in Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1338 (8th Cir.1996), which we cited approvingly in Aka, the plaintiff "acknowledged" that he was fired because the employer wanted, against plaintiff's will, to cover up its collection of millions of dollars in violation of SEC regulations. "This acknowledgment standing alone would completely refute [the plaintiff's] claim of age discrimination." Id. at 1337. And in Visser v. Packer Engineering Assoc., Inc., 924 F.2d 655, 657 (7th Cir.1991) (en banc), also cited approvingly in Aka, the plaintiff asserted age discrimination but offered evidence that the real reason was disloyalty to the firm's chief executive officer. "It does not show or even tend to show that [the plaintiff] was fired because of his age. It tends if anything to show the opposite." Id.
 
 
 11
 Assuming in Carpenter's favor that the evidence is such that a reasonable jury could reject Fannie Mae's proffered reasons for selecting Biegel, her entire theory nonetheless rests on the premise that Fannie Mae's male upper management concocted a scheme to defeat her as a candidate for promotion because of her outspoken advocacy of eliminating fraternization in the workplace. Carpenter's stance that she was not promoted because of her views is unequivocal. Summing up the evidence and her take on it she says, "Accordingly, there is no explanation for eliminating Carpenter as a candidate for promotion except the discriminatory bias created by her active participation in seeking to protect the rights of women employees." App. Br. at 33 (emphasis in original).
 
 
 12
 But the espousal of views for or against fraternization in the workplace is not a surrogate for being male or female. In Rothmeier, plaintiff attempted a parallel theory, claiming that high ethical standards were so closely associated with age that to penalize an employee for his whistleblowing was the equivalent of penalizing him for age. 85 F.3d at 1337-38. The court rejected the idea as "premised on a highly dubious correlation," id., and we find Carpenter's implicit claim of correlation equally dubious.[2]
 
 
 13
 Everyday life refutes the notion that skepticism of or even opposition to an anti-fraternization policy proposal constitutes discrimination against women. Persons who devote their careers largely to seeking effective legal restriction of sexual harassment commonly insist on a sharp distinction between workplace relationships that are welcome on both sides (even with Olympian status differentials between the participants), and unwelcome attentions. See, Kathy Rodgers, Commentary, "What Is and Isn't Sexual Harassment," Chicago Tribune, Feb. 6, 1998, at 31 (author, executive director of NOW Legal Defense and Education Fund, insists staunchly on need that sexual attentions be unwelcome for them to be sexual harassment, and rejects notion that status differential of any sort could substitute for unwelcomeness); Gloria Steinem, Editorial, "Women and the White House, 'No' means 'No,' and 'Yes' means 'Yes,' " Fort Worth Star-Telegram, March 29, 1998, at 3 ("The power imbalance between [parties] increase[s] the index of suspicion, but ... [w]elcome sexual behavior is about as relevant to sexual harassment as borrowing a car is to stealing one"). The position of Fannie Mae's management on either side of this issue is in no way a proxy for gender bias.
 
 
 14
 In her reply brief Carpenter offers a convoluted argument trying to forge such a link. Citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998), and Meritor Savings Bank v. Vinson, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), she argues that the voluntariness of workplace sexual relations does not end the inquiry regarding sexual harassment and that the inference of sex discrimination is easy to draw in most instances of sexual harassment. Therefore, she concludes, the anti-fraternization policy "is directly related to sexual harassment, because without such a prohibition, an employer would need to investigate every case of fraternization to determine whether sexual advances are unwelcome." But, even accepting Carpenter's Orwellian assumption that every instance of fraternization must be investigated lest it actually be sexual harassment, the argument assumes rather than establishes its equation of gender with anti-fraternization advocacy.
 
 
 15
 Similarly, Carpenter cites Broderick v. Ruder, 685 F.Supp. 1269, 1277-78 (D.D.C.1988), for the proposition that she can raise the sexual discrimination claim even though she was not the victim of sexual harassment. But that case held only a plaintiff could make out a hostile work environment claim on the basis of a pervasive atmosphere of sexual harassment of others, including a general practice of trading advancement for sexual accommodation. Id. at 1277-78. Carpenter, of course, claims neither hostile work environment nor the existence of any such practice at Fannie Mae.
 
 
 16
 Finally, in her reply brief Carpenter hints at another alternative--that her "zeal [in pursuing anti-fraternization policies] did not fit male management's stereotype of a woman's role in Fannie Mae's environment of insensitivity to the sexual harassment of women." If Fannie Mae treated zeal in women differently from zeal in men, of course Carpenter would have a case. But she has neither offered evidence nor (until the Reply) even contended that this was such a case. Accordingly, we can only read this passage as essentially a restatement of her basic claim that Fannie Mae should be held liable because it denied her promotion because of its resistance to her fraternization policy proposals. But, as we have said, that does not make out a case of gender discrimination.
 
 
 17
 The judgment of the district court is affirmed.
 
 
 18
 So ordered.
 
 
 
 [1]
 These past evaluations, which Kelly says she did not consult, seem to support the conclusion that as an employee Biegel was clearly as qualified as, if not superior to, Carpenter. Both Biegel and Carpenter received similar numerical grades over the past five years, and in the year before the reorganization Biegel received a higher score. Also in evidence were extensive sets of notes made in 1994 and 1995 either in preparation for meetings of Carpenter's and Biegel's bosses relating to personnel matters or as memorials of statements made at such meetings. Although the notes reflect statements (made or intended to be made) characterizing Carpenter fairly favorably, the statements about Biegel are more favorable, e.g., "broader" (in explicit contrast with Carpenter, who is twice dubbed "narrow" and said to "need rounding"), "good presence," "a star," with feedback from the General Counsel's "clients" within Fannie Mae expressing special enthusiasm (one of them, a woman, would "take [him] on in a second"). The overall gist of these was evidently communicated to Kelly, who met with Zoellick soon after joining Fannie Mae in 1995 to discuss the vice presidents in the legal department
 
 
 [2]
 Of course civil rights statutes may make retaliation a claim in some circumstances, such as Title VII's rule against an employer's discriminating "against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a)(1994). But Carpenter has framed her suit as one of sex discrimination, not retaliation, and in any event makes no claim that fraternization is an employment practice made unlawful by the antidiscrimination laws