**Michael SWANKS, Appellee,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant.**

**No. 98–7115.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 29, 1999.

Decided June 18, 1999.

---

Lisa D. Fentress argued the cause for appellant. With her on the briefs were

Cheryl C. Burke, Robert J. Kniaz and Gerard J. Stief.

Woodley B. Osborne argued the cause and filed the brief for appellee.

Before: EDWARDS, *Chief Judge,* WALD and ROGERS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge:*

In *Swanks v. WMATA,* 116 F.3d 582, 583 (D.C.Cir.1997) ("*Swanks I*"), the court held that receipt of disability benefits under the Social Security Act, *see* 42 U.S.C. § 423 (1994), did not bar recovery under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 (1994), *et seq.,* and remanded the case to the district court for a jury to determine whether the Washington Metropolitan Area Transit Authority ("WMATA") had discriminated against Michael Swanks. *See* 116 F.3d at 587–88. Thereafter a jury found for WMATA on Swanks' claim that WMATA had failed to accommodate his request for additional exercise, and for Swanks on the question of whether WMATA had fired him because of his disability. On appeal, WMATA contends that Swanks failed to show that he remained qualified for his position as a special police officer once his commission as a special police officer under District of Columbia law expired, and that he had been discriminated against because of his disability. Inasmuch as the only question before this court is whether, absent an error of law by the district court, no reasonable juror could find that WMATA discriminated against Swanks because of his disability, and there was no legal error and ample evidence on which the jury could reasonably find discrimination, we affirm.[1]

## I.

Michael Swanks suffers from a congenital condition known as spina bifida, which affects his urinary tract and leads to incontinence and infections. At the time he was hired in 1989 by WMATA as a special police officer, Swanks informed an interviewer and a WMATA examining physician of his condition. He initially worked at locations in the District of Columbia, Virginia, and Maryland, but his work site "stabilized" in 1991 when he began working at the West Falls Church METRO stop in Virginia. Viewing the evidence most favorably to Swanks, as we must, *see Boodoo v. Cary,* 21 F.3d 1157, 1159, 1161–62 (D.C.Cir.1994); *Anderson v. Group Hospitalization, Inc.,* 820 F.2d 465, 471–72 (D.C.Cir.1987), Swanks missed work a few more days than allowed as a result of his condition and provided doctor's certificates regarding his absences.[2] His performance reviews described him as generally effective and competent, but one noted that his "unscheduled absences ... indicate[ ] a lack of stability which has affected his leadership." In June 1991, he received a letter warning him that "further unscheduled absence could lead to more severe disciplinary action." The following month he provided WMATA with a letter from his doctor explaining that he had spina bifida and that it affected his urinary tract; a few days later, he provided a doctor's statement describing the symptoms as fever, vomiting, diarrhea, nausea, frequent urination, and lower back pain—many of the reasons that Swanks had described when taking sick leave. In addition, Swanks testified that he discussed his symptoms with his WMATA supervisors

---

1. On April 8, 1999, the court denied WMATA's motion to postpone oral argument in view of the Supreme Court's grant of a petition for writ of certiorari in *Cleveland v. Policy Management Sys. Corp.,* 120 F.3d 513, 518 (5th Cir.1997) *See* —— U.S. ——, 119 S.Ct. 39, 142 L.Ed.2d 30 (1998). The Supreme Court has since decided *Cleveland* and its disposition has no bearing on the issue before

this court. *See Cleveland v. Policy Management Sys. Corp.,* —— U.S. ——, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999).

2. Swanks testified that he used his sick leave only when he was sick, using twelve days in 1989–90, 18 days in 1990–91, and 22 days in 1991–92. Swanks also testified that he used annual leave for vacation and to care for his wife when she was sick.

and doctors. Yet in late 1992, when he asked if he could get either more exercise to accommodate these symptoms or a transfer, Darryl Rice, the captain of WMATA's special police officers, told him that WMATA's tight financial situation made that impossible and that "[t]he best thing for [Swanks] to do was resign and go in[to] the construction field."

In September 1992, as part of a system-wide spot check, a supervisor asked to see Swanks' special police commission. Swanks stated that it was in his wallet, which he had left the day before with his brother-in-law. Upon retrieving the wallet, however, he discovered that the commission was missing and went to the D.C. Metropolitan Police Department for a replacement. He was unaware before then that his commission had expired over a year earlier. Captain Rice subsequently recommended that Swanks be dismissed for not having his commission and for lying about having lost it when WMATA asked if he had it. In October, Swanks was dismissed from his job. When his wife telephoned to ask why her husband was being fired, Captain Rice told her that the termination was due to her husband's absences and not the expiration of the "gun permit." Swanks filed suit under the ADA, alleging that WMATA failed to provide reasonable accommodation for his disability and that it discharged him because of his disability.

## II.

Although the court reviews *de novo* the denial of WMATA's motion for judgment as a matter of law, or in the alternative, for a new trial, *see Scott v. District of Columbia,* 101 F.3d 748, 752 (D.C.Cir.1996), it is long settled that "the jury's verdict will withstand challenge unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict." *Id.* at 753. Because the evidence presented by the plaintiff must be "significantly probative," rather than "merely colorable," *Siegel v. Mazda Motor Corp.,* 878 F.2d 435,

437 (D.C.Cir.1989), "the question for us is not whether there was *some evidence,* but whether, in terms of the actual quantum and quality of proof necessary to support liability, there was *sufficient evidence* upon which a jury could properly base a verdict for the [plaintiff]." *Id.* (quotation marks omitted). In other words, if there was no error of law by the district court in allowing issues to be represented to the jury, the remaining question is whether no reasonable juror could find that WMATA had fired Swanks for a discriminatory reason. *See Anderson,* 820 F.2d at 472–73; *cf. Milone v. WMATA,* 91 F.3d 229, 232 (D.C.Cir.1996).

### A.

Under the now familiar three-part protocol established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further elaborated upon in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the plaintiff bears the initial burden to establish by a preponderance of the evidence a *prima facie* case of discrimination. The employer then bears the burden to produce evidence of a legitimate nondiscriminatory reason for its action. *See Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C.Cir.1998) (in banc). If the employer can meet this burden of production,

> the focus of proceedings at trial ... will be on whether the jury could infer discrimination from the combination of the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Id.* at 1289. The plaintiff retains the ultimate burden of persuasion, to demonstrate that he was in fact the victim of intentional discrimination. *See id.* at 1290.

■ To sustain a claim under the ADA, Swanks must prove that he had a disability within the meaning of the ADA, that he was "qualified" for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability. *See Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135 (8th Cir.1999); *Martinson v. Kinney Shoe Corp.,* 104 F.3d 683, 686 (4th Cir. 1997); *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995). On appeal, WMATA contends that Swanks was unqualified for his position and therefore cannot establish a *prima facie* case of discrimination. It further contends that the evidence demonstrated that WMATA terminated Swanks for legitimate, non-discriminatory reasons, specifically that "he did not have a valid police commission and he lied about the status of the license."

The ADA provides that "[n]o covered entity shall discriminate against a *qualified individual* with a disability because of the disability ... in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1994) (emphasis added). The Act defines a "qualified individual" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). It further provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.*; *cf. Carr v. Reno,* 23 F.3d 525, 529 (D.C.Cir.1994).

■ Whether an individual is "qualified" for a job may at times present a pure question of law to be resolved by the court, but it may also, as in this case, be a question of fact that must be resolved by a fact-finder at trial. Thus, for example, in *Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626 (7th Cir.1998), the Seventh Circuit concluded that a factual dispute existed as to whether an employer required a certain type of employee to have a commercial driver's license and consequently, the employer "may not obtain summary judgment by declaring it has a policy when [the employee] may have evidence that [the employer] follows the policy [of requiring commercial licenses] selectively." *Id.* at 632; *see also Griffith v. Wal–Mart Stores, Inc.,* 135 F.3d 376, 383–84 (6th Cir.1998). The issue of qualification in the instant case involved a similar factual dispute.

■ WMATA contends that the district court erred in denying its motion for judgment as a matter of law because the evidence showed that possessing a special police commission is a requirement for Swanks' position and that Swanks was therefore not qualified because he had allowed his commission to expire. The special police officer commission, WMATA contends, is "tantamount to a professional licence and ... without this license there is no authority to act in the capacity of special police officer." In WMATA's view, the job description combined with Captain Rice's testimony "made it clear that an essential requirement of the job of special police officer was the maintenance and possession of a special police commission." Specifically, Captain Rice testified that the special commission was required of all special police, including those stationed in Virginia or Maryland, because "we work out of the District of Columbia," which requires the license and which covers 90 to 95 percent of Metro locations.[3] He also testified that if the D.C. Metropolitan Police discover a special officer operating

---

**3.** *See* D.C.Code Ann. § 4–114 (1994) (conferring authority on the Mayor to appoint special    police officers).

without a commission in the District, WMATA and the officer can be fined.[4]

The difficulty with WMATA's position is twofold. First, WMATA's personnel description of the special police officer job states that an individual only need have the "[a]bility to obtain and maintain a Special Police Commission." The "minimum qualifications and experience" include only that the applicant have graduated from high school (or received an equivalent certificate), and be at least 21 years old and a United States citizen (or have an equivalent combination of education and experience); there is no mention of the commission. If after obtaining the commission, the officer allows it to expire, official WMATA policy provides that expiration "will result in your not being permitted to work until the job position requirement is met;" it does not provide for automatic discharge. Second, Swanks testified that in practice WMATA only required that he have the ability to maintain the commission. When he initially informed a supervisor that he had lost his commission, he testified that he was informed that he "did not need a gun permit to work in the State of Virginia" and that he was to report to work. Similarly, when it later was clear his commission had expired, he was told that he would be on leave until he renewed it. This evidence of WMATA's practice was supported by Captain Rice's testimony describing how new employees would apply for the commission after being hired and that the application process could last four to eight months.

The district court, therefore, properly denied WMATA's motion for judgment as a matter of law in light of evidence making qualification an issue of fact. Based upon the evidence, a reasonable juror could find that possessing the commission was not a prerequisite to being hired, and that new employees simply had to possess the *ability* to obtain such a commission, and hence the jury had sufficient evidence to find that Swanks was a "qualified individual" with a disability under the ADA.

### B.

■■■ The question remains whether WMATA presented a nondiscriminatory reason for discharging Swanks and if so, whether Swanks presented evidence upon which a reasonable juror could rely to conclude that WMATA's true motivation for firing him was discriminatory. Our standard of review here is deferential: a jury's verdict may be overturned only if no reasonable juror could find that WMATA discriminated against Swanks. *Anderson,* 820 F.2d at 472–73. The court considers all of the evidence that the jury had before it, not only Swanks' *prima facie* case but also his evidence that he was fired for his absences rather than his lack of a special commission. *Aka,* 156 F.3d at 1289.

The evidence before the jury as to WMATA's true reason for terminating Swanks was conflicting. On the one hand, Captain Rice testified, and his memorandum recommending Swanks' dismissal stated, that the cause for Swanks' discharge was the expiration of the special commission and Swanks' alleged fabrications when WMATA asked to see his commission. On the other hand, Swanks testified that he was unaware that his commission, which he believed he had lost, had expired.[5] Furthermore, his

---

4. *See* D.C. Mun. Regs. tit. 6A, §§ 1101.2, 1104.2, 1108.1 (1988). Section 1104.2 of Title 6A provides that:

   Each special police officer appointed under the provisions of D.C.Code § 4–114 (1981), shall, within twenty-four (24) hours after the expiration or revocation of his or her commission ... deliver to the Chief of Police his or her badge, commission, or other emblem of authority, and upon his or her failure so to do, he or she shall, upon conviction thereof in the Superior Court for the

District of Columbia, be punished by a fine or [*sic*] not more than three hundred dollars ($300).

5. Although Swanks maintains that WMATA presented "no evidence of untruthfulness," Captain Rice's October 1992 memorandum stated that "Officer Swanks' inability to provide a copy of his D.C. Special Police Commission and his subsequent story of his "brother-in-law" taking his wallet only emphasises [*sic*] that he: a) was aware that his

wife's testimony, that Captain Rice had told her that her husband's absences, rather than the "gun permit," was the reason for his discharge, was bolstered by evidence that WMATA had threatened disciplinary action because of his absences and had been unreceptive to his attempts, with doctor's statements, to explain how his condition caused these absences.[6]

The issue of witness credibility "is quintessentially one for the finder of fact," *Aka,* 156 F.3d at 1299; *see also Baert,* 149 F.3d at 633, and the medical evidence permitted a reasonable juror to find that Swanks' absences were due to his disability. A reasonable juror could find that WMATA, being unwilling to tolerate an employee with repeated absences, decided to apply its special commission requirement more strictly than it normally would to remove Swanks because of his disability. In that sense, WMATA's contention that this case is about applying the same rules to persons with disabilities as

those without is somewhat ironic inasmuch as the jury apparently accepted Swanks' position that WMATA applied its commission requirement inconsistently as an excuse to discharge him, applying a harsher rule, rather than the same rule, to Swanks because of his disability.[7]

To the extent that WMATA contends for the first time in its reply brief, and at oral argument, that even if Swanks could show that he was fired for excessive absenteeism, regular attendance at work is an "essential function" of his job, its argument comes too late.[8] *See Chedick v. Nash,* 151 F.3d 1077, 1084 (D.C.Cir.1998). At trial, WMATA only argued that Swanks was unqualified for his position, not that he was fired because of abuse of his sick leave. Trial Tr. at 87:1–4 (Apr. 9, 1998). Abuse of sick leave as the reason for dismissal would contradict both Captain Rice's testimony and his memorandum recommending Swanks' dismissal for failure to have a valid commission and lying about

commission was invalid; [and] b) wanted to have time to get to MPD [Metropolitan Police Department] to obtain a renewal," and further, that Swanks admitted to MPD Detective Owens that he was aware his commission had expired "but only after he was confronted with the information."

6. This evidence contradicts WMATA's statement in its brief that it "had no way of knowing that Mr. Swanks' excessive absenteeism was a result of his spina bifida occulta."

7. .Citing *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991), WMATA contends that it would be irrational for it to hire Swanks knowing of his disability only to fire him because of that same condition. This argument is specious, however for, unlike the facts in *Proud,* different individuals hired Swanks in 1989 (*i.e.* then-Lieutenant Kielbiewicz) than fired him several years later in 1992 (*i.e.* Captain Rice, Inspector Robert Zaza, and Chief of WMATA Police Burton Morrow). Furthermore, *Proud* was an age discrimination case. Age is a fixed variable; here it is possible that WMATA may not fully have appreciated the amount of absenteeism that would be required for Swank's disability, or that his condition could have worsened over time, requiring greater absenteeism. *Cf. id.*

at 797–98; *Waldron v. SL Indus.,* 56 F.3d 491, 496 n. 6 (3d Cir.1995).

8. WMATA's regulations provide that a special police officer "*must be* dependable, regular in attendance and never absent from work without making advance arrangements with the sergeant, except in the case of illness or extreme emergency." Def.'s Ex. 7, ¶ 10 (Protective Services Bureau Rules & Regulations for Special Police Officers). They also define "unsatisfactory attendance" as "unscheduled absences so frequent as to indicate that the employee is undependable." *Id.* ¶ 24. Captain Rice testified that special police officers accrue 3.75 hours of sick leave and 3.75 hours of annual leave every two weeks, in addition to federal holidays. Over the course of approximately 26 pay-periods an officer would therefore annually accrue 97.5 hours of sick leave. Although Captain Rice testified that officers accrue approximately 10 to 11 days of sick leave per year, with a tour of duty lasting 7.5 hours, the number of sick days would equal 13 (97.5 divided by 7.5). By that calculation, Swanks used less than the full annual amount of sick leave during his first year and exceeded that amount by five days in his second year and nine days in his third year.

it. Moreover, during closing arguments, WMATA disavowed any connection between Swanks' absences and its decision to terminate him. In that light, "if the only explanations set forth [by the employer] in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination." *Aka*, 156 F.3d at 1292. The jury need not adopt a potentially nondiscriminatory explanation that the employer itself has attempted to discredit.[9]

Finally, WMATA contends in its reply brief that even if it "had full knowledge that Mr. Swanks' absenteeism was caused by his disability, there can be no finding of discrimination because the jury found against Mr. Swanks on the accommodation issue [claim]." Because Swanks had no opportunity to respond to this contention in his brief, the court need not consider it. *See Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C.Cir.1992). Even if the contention were facially appealing, Swanks' accommodation request was to be allowed more exercise at work and more sick leave as a way to ward off some of the symptoms of his condition that caused his absences.[10] Finding against him on that claim, a juror could still reasonably find that WMATA fired Swanks because of his disability in violation of the ADA. As the court recognized in *Aka*, a reasonable accommodation claim "is not subject to analysis under *McDonnell Douglas*, but has its own spe-

cialized legal standards." 156 F.3d at 1288.

Accordingly, we affirm the judgment.

---

9. WMATA's reliance on *Carr v. Reno*, 23 F.3d 525 (D.C.Cir.1994), is to no avail. *Carr* was a summary judgment case; by contrast our review of the jury's verdict is not *de novo*, and WMATA did not present evidence, in response to Swanks' *prima facie* case, that he was fired for excessive absenteeism. *Carr*'s excessive absenteeism theory could have been applicable had WMATA presented such evidence; a jury then might have concluded that his absences were so "prolonged, frequent, and unpredictable" as to make him unqualified to perform the essential functions of a time-sensitive job. *Id.* at 530; *cf. Carpenter v. Federal Nat'l Mortgage Ass'n*, 165 F.3d 69, 72

(D.C.Cir.1999). However, WMATA would still have to show in the instant case that no reasonable juror could have found that discrimination, rather than lack of qualification or undue hardship, was the true motivation for Swanks' discharge. *See generally Barth v. Gelb*, 2 F.3d 1180, 1186–87 (D.C.Cir.1993); *Anderson*, 820 F.2d at 472.

10. Although in *Swanks I* the court characterized this claim as a request for more exercise, *see Swanks I*, 116 F.3d at 583, during rebuttal closing argument, Swanks' counsel stated that Swanks also wanted more sick leave as an accommodation.